David Allen GARDNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 68856.

Court of Criminal Appeals of Texas, En Banc.

April 8, 1987.

Jack V. Strickland, Fort Worth, for appellant.

Mac Smith, Dist. Atty. and Dan Carney, Asst. Dist. Atty., Weatherford, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction for capital murder. Punishment was assessed at death.

On August 26, 1980, two fourteen year old runaways, Rocky Allen Crecy and Kandi Kae Reynolds, were hitchhiking along an interstate highway near Weatherford. Apellant, who was driving by, stopped and picked the teenagers up. Appellant drove the pair down the interstate and eventually turned down a gravel road. He pulled off the road beside a bridge and told the teenagers to get out of the car. The trio walked down the embankment. There the appellant stabbed Crecy numerous times and left him there. He took Reynolds to a location near Lake Weatherford where he stabbed her numerous times, hit her in the head with a rock and then abandoned her. Meanwhile, Crecy had made his way to a

farmhouse. Help was summoned and he was taken to a hospital. He survived his wounds. Reynolds died from her wounds. On August 29, 1980, appellant was arrested. After his arrest, he led officers to Reynolds' body. Appellant was charged with killing Reynolds in the course of a kidnapping.

In his first seven points of error, appellant challenges the admission of the psychiatric testimony of Dr. Clay Griffith during the punishment phase of the trial. Appellant filed a motion to suppress testimony concerning the psychiatric examination. A hearing was held outside the jury's presence on appellant's motion. The trial court denied appellant's motion and during the punishment phase of the trial Dr. Griffith testified that he was one hundred percent certain that appellant would kill again.

The record shows that on or about September 2, 1980, shortly after appellant's arrest for this offense but before his indictment, a justice of the peace appointed an attorney by the name of Ed Todd to represent appellant. Todd immediately began investigating the case and after talking with appellant's mother he came to the conclusion that appellant should be examined by a psychiatrist, a psychologist and perhaps even a neurologist. On several occasions over the next few days he discussed the possibility of such an examination with members of the district attorney's staff. These conversations encompassed the possibility of an insanity defense, Todd's belief that appellant might be incompetent to stand trial and appellant's suicidal tendencies. During at least one of these conversations several names were

discussed including Dr. Clay Griffith of Dallas and Dr. James Grigson of Dallas.[1] One of these conversations occurred in the trial judge's chambers with Todd, the district attorney and the trial judge present, at which time the judge was informed that a psychiatric examination was going to be requested.

On September 22, 1980, the district attorney sent Todd a copy of a proposed motion and order for psychiatric examination and asked him to sign it if he was in agreement. Todd informed the district attorney that although he would not oppose such an examination, he did not want to formally join in the motion for the reason that it might preclude any attorney who might be appointed to represent appellant in the future from obtaining further examination by a psychiatrist of his or her own choosing. When asked specifically at the hearing on appellant's motion to suppress if he was in agreement with the State's request for a psychiatric examination, Todd replied as follows:

"Both the District Attorney's staff, as well as myself, felt like there was a need for this. When you talk about in terms of an agreement, I would not consider that all of the loose ends were tied up enough to say we had an agreement; but certainly, we all felt like there was a need for a psychiatric examination."

At that time the district attorney informed Todd that he was going to go ahead and request a psychiatric examination. On September 29, 1980, pursuant to a motion by the State, the trial court signed an order for appellant to be examined by Dr. Griffith and Dr. Grigson.[2] Todd received a

1. During the hearing on appellant's motion, Todd testified that he spoke with Dr. Griffith by telephone on or about September 3, 1980. Todd testified that the twenty-five minute conversation concerned Dr. Griffith's credentials. Todd also testified that he did not remember indicating to Dr. Griffith that he was agreeing to any psychiatric examination. Griffith testified that he spoke with Todd concerning the content of a psychiatric examination. Griffith further testified that Todd then informed Griffith about certain areas that he might want to question appellant about, for example alcohol and appellant's suicidal tendencies. Griffith testified that he and Todd discussed the fact that the exami-

nation would encompass competency, insanity and future dangerousness. At the conclusion of their conversation, Griffith felt that Todd was in agreement that he should examine appellant.

2. Neither the motion nor the order specify the reasons for the psychiatric evaluation. The motion merely requests the Court to "appoint Dr. James P. Grigson and Dr. Clay Griffith, Psychiatrists, to conduct a full psychological and psychiatric examination of the said David Allen Gardner." The order merely provides that: "It is therefore ordered that the said David Allen Gardner submit to said psychological and psychiatric examinations and that said examina-

copy of this order around 10 a.m. on September 30, 1980. He immediately called the Parker County Jail and was informed that appellant had already left for Dallas.

Appellant was examined for two hours during the evening of September 30 at the Dallas County jail by Drs. Griffith and Grigson. Griffith testified that, before the examination began, appellant's rights were read to him, including the fact that Judge Hopkins had ordered him to undergo a psychiatric examination. The appellant was told that a final report would be sent to the court outlining the doctors' findings regarding appellant's competency to stand trial and his sanity at the time of the offense. Appellant was also told that anything he said could be used against him or could be used for him at some later date in the courtroom. Thus he had a right to remain silent and a right to consult with his attorney about the examination. When the doctors asked appellant if he had any questions regarding his rights, he replied that he understood them and wished to proceed with the examination.

Appellant was indicted for the offense of capital murder on November 13, 1980. Thereafter, on November 17, 1980, Jack Strickland was appointed to defend appellant in place of Todd. On December 30, 1980, Strickland, on behalf of appellant, filed a motion for another psychiatric examination to again determine appellant's competency to stand trial. This motion was granted. On that same date, Strickland also gave written notice of his intention to present the defense of insanity at trial.[3] On January 23, 1981, Strickland filed a motion for a psychological examination of appellant again for the purpose of determining appellant's competency. The court also granted this motion. Jury selection in this case began on January 27, 1981.

In his first point of error appellant contends that the trial court violated Article 46.02, V.A.C.C.P., by ordering a psychiatric examination where no written motion requesting such an examination had been filed by appellant prior to the trial of this case. Article 46.02, supra, the statute dealing with incompetency to stand trial provides in pertinent part:

"Sec. 2. (a) The issue of the defendant's incompetency to stand trial shall be determined in advance of the trial on the merits if the court determines there is evidence to support a finding of incompetency to stand trial on its own motion or on written motion by the defendant or his counsel filed prior to the date set for trial on the merits asserting that the defendant is incompetent to stand trial.

"(b) If during the trial evidence of the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial.

"Sec. 3. (a) At any time the issue of the defendant's incompetency to stand trial is raised, the court may, on its own motion or motion by the defendant, his counsel, *or the prosecuting attorney,* appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to his competency to stand trial and to testify at any trial or hearing on this issue." (Emphasis added)?

▆▆▆ Appellant maintains that Section 2 of Article 46.02, supra, provides that such an examination of a defendant can only occur if the defendant files a motion to determine competency before trial or if the court on its own motion determines there is evidence to support a finding of incompetency. We disagree with appellant's assertion. Our reading of the statute indicates that Section 2, supra, covers the *legal determination* of the issue of appellant's competency to stand trial. This may encompass hearing evidence from any source, including psychiatric or psychological examination. Section 2, however, does not govern the appointment of experts to conduct such an examination. Appointment of

---

tions be conducted by Dr. James P. Grigson and Dr. Clay Griffith."

3. This defense was never urged at trial.

such experts is covered by Section 3. Clearly, any time the issue is *raised* by the court or any party the court may appoint experts to examine the defendant. The fact that psychiatric examinations are ordered by a court does not constitute a *determination* that an issue as to the defendant's competency exists. *Johnson v. State,* 564 S.W.2d 707, 711 (Tex.Cr.App. 1978) (Opinion on Rehearing). Only when the requirements of Sec. 2 are met is the judge required "to measure the propriety of impaneling a jury to determine present competency to stand trial." *Sisco v. State,* 599 S.W.2d 607, 610 (Tex.Cr.App.1980). In the instant case, no request for such a determination was filed by appellant nor did the trial court apparently feel that there was evidence to support a finding of incompetency to stand trial. However, based upon the information available to the trial court prior to the examination, we find that the trial court acted properly in appointing Drs. Griffith and Grigson to examine appellant.[4] This point of error is overruled.

◼ In his second point of error, appellant argues that Article 46.02, supra, was violated when the trial judge allowed the psychiatric examination of appellant to take place when no order was filed or signed by the court and no motion was entered in the papers of the court before the date of the examination. The record clearly shows that the order for the psychiatric examination was signed by the trial judge on September 29, 1980, one day before the examination occurred. The State's motion and the accompanying order were not filed in the court records however, until February 18, 1981. Article 46.02, supra, contains no provision regarding the signing or filing of such orders. Specifically, there is no provision which provides that before the psychiatric examination be conducted, the order providing for such examination be filed in the court records. We find no

violation of Article 46.02, supra. This point of error is overruled.

Next appellant contends that Article 46.-03, V.A.C.C.P., was violated when the court appointed Grigson and Griffith to examine appellant before a notice of intention to offer an insanity defense had been filed. Article 46.03, supra, provides in pertinent part that:

"Sec. 2. (a) A defendant planning to offer evidence of the insanity defense shall file a notice of his intention to offer such evidence with the court and the prosecuting attorney:

(1) at least 10 days prior to the date the case is set for trial; or

(2) if the court sets a pretrial hearing before the 10–day period, the defendant shall give notice at the hearing; or

(3) if the defendant raises the issue of his incompetency to stand trial before the 10–day period, he shall at the same time file notice of his intention to offer evidence of the insanity defense.

"Sec. 3. (a) If notice of intention to raise the insanity defense is filed under Section 2 of this article, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health and mental retardation to examine the defendant with regard to the insanity defense and to testify thereto at any trial or hearing on this issue."

◼ As noted above, the trial court was authorized under Article 46.02, supra, to order a psychiatric examination. Because a psychiatric examination was properly ordered under Article 46.02, supra, there is no need to determine if the requirements of Article 46.03, supra, were met. Furthermore, we find that any error under Article 46.03, supra, was waived when, on December 30, the appellant timely filed his notice of intention to use the insanity defense.

4. The U.S. Supreme Court noted in footnote 1 of their opinion in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) that the psychiatric evaluation in that case had been ordered even though defense counsel had not put into issue Smith's competency to stand trial or his sanity at the time of the offense. The court made no ruling on the appropriateness of the trial judge's order.

Appellant's third point of error is over-ruled.

In his fourth point of error, appellant argues that appellant's Sixth Amendment right to counsel was violated when appellant was examined by Griffith and Grigson without notice being given to his attorney.

■ Initially we note that appellant has not preserved this issue for review. Appellant filed a motion to suppress the testimony concerning the psychiatric examination. Although appellant based his motion to suppress on the Sixth Amendment, the emphasis he urged was different than the emphasis which he is now arguing on appeal. The crux of the motion was that appellant and his attorney were not given notice of the motion requesting the examination, that appellant was not present at any hearing regarding the motion for psychiatric examination and thus, appellant had no opportunity to be heard on the subject of such an examination. At the hearing on appellant's motion to suppress, no mention was made of the Sixth Amendment. When Dr. Griffith testified at trial concerning appellant's future dangerousness, appellant's only objection was that the testimony invaded the province of the jury. On appeal, appellant argues that his Sixth Amendment right to counsel was violated because his attorney was not notified of the psychiatric examination. Because neither appellant's objection at trial nor his motion to suppress comports with the error presented on appeal, error, if any, is not preserved. *Vanderbilt v. State*, 629 S.W.2d 709, 721 (Tex.Cr.App.1981); *Green v. State*, 682 S.W.2d 271, 294 (Tex.Cr.App. 1984).

Even if error had been properly preserved, we find that appellant's contentions have no merit. Appellant argues that the informal discussions between appellant's attorney, the prosecutors and the trial judge do not suffice as adequate notice. He relies on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Mays v. State*, 653 S.W.2d 30 (Tex.Cr.App. 1983).

In *Estelle v. Smith*, supra, after Smith had been indicted for murder with malice aforethought, the State of Texas announced that it would seek the death penalty. Thereafter a district judge informally ordered the prosecutor to arrange a psychiatric examination of Smith by Dr. Grigson for the purpose of determining Smith's competency to stand trial. The evidence was controverted as to whether defense counsel was notified prior to the examination that Grigson was going to examine Smith. Grigson determined that Smith was competent to stand trial and notified the trial judge of the finding by letter. This letter was filed with the court's papers in the case. The Supreme Court noted in its opinion that besides advising the trial court of Smith's competency, the report termed Smith a "severe sociopath," but it contained no more specific reference to Smith's future dangerousness. Smith was tried and convicted. During the punishment phase, the State called Grigson to the stand. At a hearing held outside the presence of the jury, Grigson testified that he had not obtained permission from Smith's attorney to examine him. Grigson then testified before the jury and predicted that Smith would commit further violent acts in the future. The jury then answered the three punishment questions affirmatively and the trial court sentenced Smith to death.

The Supreme Court found that since Smith had already been indicted and an attorney appointed to represent him that he had a Sixth Amendment right to the assistance of counsel before submitting to the pretrial psychiatric interview. The Supreme Court found that Smith's Sixth Amendment rights were violated:

"Defense counsel, however, were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed". 451 U.S. at 470–71, 101 S.Ct. at 1876 (footnote omitted).

A similar situation occurred in *Mays v. State*, supra, another capital murder case. The trial judge in *Mays*, after conducting a hearing on the State's motion, ordered Mays to undergo a psychiatric examination by Dr. Grigson for the purpose of determining his competency to stand trial and his sanity at the time of the offense.[5] At no time was Mays' counsel informed that the examination was going to encompass the issue of future dangerousness. At the punishment phase of the trial, Grigson testified that Mays was an "incurable and untreatable" sociopath. This Court equated this testimony to a prediction of future dangerousness and found that *Estelle v. Smith* had been violated because of the lack of notice to defense counsel.

■ The instant case is distinguishable from both *Estelle v. Smith* and *Mays* in that appellant's attorney was in full agreement that there was a need for a psychiatric examination. Furthermore the record shows that after he decided he should not join in a motion with the State in requesting such an examination, the State clearly informed him that they would be requesting the court to order the examination. The record also shows that at least one of these discussions concerning the need for a psychiatric examination occurred in front of the trial judge and appellant's attorney knew that the judge was going to approve any request for a psychiatric examination. We find that appellant's attorney was given more than adequate notice that a psychiatric exam was going to be conducted. Furthermore, the record clearly reflects that appellant's attorney was told by one of the examining doctors almost a month prior to the examination that it would encompass future dangerousness. We find no deprivation of appellant's Sixth Amendment rights.

In his seventh point of error, appellant complains that the warnings given to him by the psychiatrists were inadequate and thus his Fifth Amendment rights were violated. As noted above, Dr. Griffith testified at trial that appellant was warned that anything he said could be used either for or against him. Appellant argues on appeal that the statement that "anything he said could be used for him" operated as an inducement and thus constitutes reversible error. Appellant cites three cases as authority for this proposition: *Unsell v. State*, 39 Crim. 330, 45 S.W. 1022 (1898); *McCain v. State*, 139 Tex.Crim.R. 539, 141 S.W.2d 613 (1949); and *Burton v. State*, 505 S.W.2d 811 (Tex.Crim.App.1974). It is important to note, however, that those cases also stand for the proposition that a timely and proper objection must be made in order to preserve error. In *McCain*, this Court reversed the conviction on original submission after finding that improper warnings were given to appellant before he confessed. However on rehearing, the conviction was affirmed notwithstanding the improper warnings because the defendant had failed to make a proper objection at trial.

■ In the instant case appellant failed to make a timely objection. Prior to Dr. Griffith's testimony before the jury, a hearing was held on appellant's motion to suppress the psychiatric testimony. Neither appellant's written motion to suppress nor his verbal objections articulated during that hearing encompass the argument he is now making on appeal. When Griffith testified before the jury, the following occurred:

"Q. Would you tell the jury what rights you are referring to?

"A. Yes. first of all, we did inform the defendant, which he knew already that—what he was coming for, for a psychiatric examination; that this was ordered by Judge Hopkins.

We informed him that a report would have to be sent to the Court stating our findings so far as whether he was competent to stand trial, whether he, in our opinion, was sane or insane at the time of the alleged offense; that in the State of Texas, there is no confidentiality so that anything that he might say could be used against him,

**5.** Mays had raised both the issue of competency and sanity.

or could be used for him at some later date in the courtroom.

"MR. STRICKLAND: Excuse me, Your Honor. I didn't hear the last testimony.

"THE COURT: If you would repeat it again, please, Doctor. The last statement.

"THE WITNESS: Part of the confidentiality is that in Texas, there is no confidentiality (sic).

Therefore, anything that a person says could possibly used against them at some future date in the courtroom or could be used for them at some time. They are appraised of Judge Porter's rule which says that a person—

"MR. STRICKLAND: Objection, Your Honor, as to what some other Court's ruling is. It is not germane as to what some other Court has ruled in regard to any matter that interjects issues from other cases into this case.

"MR. SMITH: Your Honor, I think he is qualified, and it is necessary under the law to inform for the record in this case all of the warnings that were given.

"THE COURT: Overrule your objection, Counsel.

"MR. SMITH: Thank you.

"MR. STRICKLAND: Please note our exception, Judge.

"BY MR. SMITH:

"Q. Continue, Doctor.

"A. That under this ruling that he had the right to remain silent, he was informed that he had a right to talk with his attorney about this, which he had done.

"We then asked him if there was anything to be clarified about these rights.

"He said no, that he did understand them, and that he wished to go ahead with the examination."

Defense counsel some time later voiced an objection that these were improper warnings but he never argued that they operated as an inducement. Because of appellant's failure to timely voice an objection, no error is preserved. *Gauldin v. State,* 683 S.W.2d 411, 413 (Tex.Cr.App.1984).

▪ Addressing the merits of the argument we find that appellant premises his contentions on Fifth Amendment grounds. However, the cases cited by appellant deal with two Texas statutes, Article 727, V.A.C.C.P. (1925), and its successor, Article 38.-22, V.A.C.C.P. We have found no cases which say that a warning such as was given in the instant case violates *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or infringes on a defendant's Fifth Amendment rights.

In *Green v. United States,* 386 F.2d 953 (10th Cir.1967), complaint was made that the warnings given to the defendants were improper in that they only stated that any statements made by the defendants could be used in court, without specifically informing the defendants that the statements could be used "against them." The court in rejecting the defendants' contentions responded:

"This contention, as well as others made in similar vein, is not well taken for as this court said in *Coyote v. United States,* 380 F.2d 305, at 308 [10th Cir. 1967]:

'Surely *Miranda* is not a ritual of words to be recited by rote according to didactic niceties. What *Miranda* does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.'" 386 F.2d at 956–957.

We find no error. Appellant's seventh point of error is overruled.

In his eighth point of error, appellant argues that the court erred in denying his motion for change of venue. The test to be applied by the trial court in determining

such a motion is whether outside influences affecting the community's climate of opinion as to a defendant are so inherently suspect that the resulting probability of unfairness requires suitable procedural safeguards. *Nethery v. State,* 692 S.W.2d 686 (Tex.Cr.App.1985); *Banks v. State,* 643 S.W.2d 129 (Tex.Cr.App.1983); *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr.App.1979). To prevail on appeal in a situation where the trial court was presented with conflicting evidence, a defendant must show that the trial court abused its discretion. *Eckert v. State,* 623 S.W.2d 359 (Tex.Cr.App.1981).

Appellant argues that the extensive news coverage at the time of the offense, at the time of appellant's arrest, in the few weeks immediately before trial and during the time of the voir dire examination of the jury was so prejudicial as to deny him a fair trial. The record shows that at the hearing on appellant's motion three local attorneys testified that appellant could not obtain a fair trial because of the surrounding publicity. This opinion was controverted by five witnesses, one of whom was called by appellant. Also introduced were a number of newspaper articles published about the offense and trial and a series of scripts concerning the offense and trial which had been broadcast during the newscasts of a local radio station. At the conclusion of the hearing the careful trial judge announced he would hold his ruling in abeyance through the voir dire examination of the potential jurors. After the completion of the voir dire examination of the fifty-ninth prospective juror, the trial court announced that it was denying appellant's motion for change of venue.

In an artfully crafted brief, appellant argues that the voir dire when taken as a whole conclusively shows that his motion should have been granted. He points to the fact that fifteen out of the seventy-seven individuals questioned had heard enough pretrial publicity of the case from either the news media or conversations with other people to have formed conclusive opinions about the guilt of appellant.

The mere fact that fifteen of the seventy-seven potential jurors were excused because they held established conclusions as to the guilt of appellant does not in and of itself demonstrate the inability of appellant to be tried by an impartial jury. In other cases where a substantial number of veniremen stated on voir dire that they held opinions as to the defendant's guilt, this Court has held that identifiable prejudice was not shown. *Adami v. State,* 524 S.W.2d 693 (Tex.Cr.App.1975) (18 of 72); *Taylor v. State,* 420 S.W.2d 601 (Tex.Cr.App.1967) (39 of 112); *Handy v. State,* 139 Tex.Cr.R. 3, 138 S.W.2d 541 (1940) (45 of 99). Furthermore, we note that all twelve of the jurors in the instant case testified that he or she would try the case strictly on the evidence introduced during the trial.

To ask that a criminal defendant be tried in a community untouched by the news media is to be unrealistic in this day and time. As we stated in *Morris v. State,* 488 S.W.2d 768 (Tex.Cr.App.1973):

"Our courts cannot and do not operate in a vacuum. Courts deal with people and crimes which are newsworthy. To require a trial of jurors who had never heard of a highly publicized crime would be impractical if not impossible. Certainly, it was never intended that jurors were to be selected from those who did not read newspapers or keep up with current events through other media. Jurors selected from such a group, if there are enough to be called a group, would not be representative. To hold otherwise would be to hold that the perpetrator of a very highly publicized crime such as the assassination of a president, a governor or any widely known person could never be tried." 488 S.W.2d at 772.

Viewing the record as a whole, we find no abuse of discretion. We note that at the end of the voir dire examination, appellant had one remaining peremptory challenge. He does not contend nor does our review of the entire voir dire examination show that he was forced to take an objectionable juror. The testimony that appellant could not obtain a fair trial in Parker County was directly contradicted by

testimony presented by the State and indeed by even one of appellant's own witnesses. Furthermore, the trial occurred some five months after the commission of the offense and although a flurry of media attention occurred at the time· of the offense and appellant's arrest and in the weeks prior to the trial, there had been little or no coverage of the offense in the intervening time. Finally, the newspaper and radio accounts concerning the case appear to be accurate, informative and objective, not inflammatory or prejudicial. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). We find no error. *Eckert v. State*, supra; *Demouchette v. State*, supra; *Bell v. State*, 582 S.W.2d 800 (Tex.Cr.App.1979); *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977). Compare: *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). This point of error is overruled.

The record shows that at the beginning of the voir dire examination of each potential juror, the trial judge made some preliminary remarks. As part of these remarks the judge would read the oath contained in V.T.C.A., Penal Code, Section 12.31(b) [6] and then ask the individual if there were any reasons why he or she could not take the oath if seated on the jury. Defense counsel made continual objection to this practice. In response to counsel's objection, the trial court assured counsel that he knew that under the decision of *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), that he could not disqualify someone solely on the basis of their refusal to take the oath and he had no intentions of doing so. Indeed the record reflects that no juror was disqualified on this basis. After the jury was seated, the court again had the jurors swear to the Section 12.31(b) oath. Defense counsel again objected to this practice in that the oath did not comply with Article 35.22,

V.A.C.C.P. This objection was overruled. In his ninth and tenth points of error, appellant contends that his Sixth Amendment and Fourteenth Amendment right to a fair and impartial trial was violated by the reading of this oath since it caused the jurors to take less seriously their deliberations on punishment and thus they were not impressed with the seriousness of the potential consequences for the appellant. He relies on *Adams v. Texas*, supra, as authority.

This same argument was made in *White v. State*, 610 S.W.2d 504 (Tex.Cr.App.1981). Because we believe the opinion in that case correctly answers the contention raised by appellant, we quote extensively therefrom:

"Appellant now cites *Adams v. Texas* [citation omitted], as the sole support of the contention now advanced. Surprisingly, however, he does not attack the exclusion of a single prospective juror because of the venireman's inability to answer the questions posed by our statute.

"Instead, as we view the record, appellant assumes that the invalidity of Sec. 12.31(b) automatically destroyed the integrity of the jury to the extent that once it was used in the jury selection, no verdict imposing the death penalty can stand. We are not persuaded that *Adams v. Texas*, supra, leads to such a result. Indeed, the *Adams Court* did not declare Sec. 12.31(b) to be unconstitutional. Instead, it held that it was the *application* of the statute which offended the *Witherspoon* doctrine.

"The Court held specifically:

"'The State could, consistently with *Witherspoon*, use § 12,31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of § 12.31(b) to exclude jurors on broader grounds

---

6. V.T.C.A., Penal Code, Section 12.31(b) provides:

"(b) Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felo-

ny. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

based on their opinions concerning the death penalty is impermissible.' (448 U.S. 38, 100 S.Ct. at 2528, 65 L.Ed.2d at 592)

"The majority opinion concluded that because *'in the present case Texas has applied § 12.31(b)'* to exclude jurors not subject to exclusion under *Witherspoon* standards, the death penalty could not be upheld. Appellant does not even make this complaint, much less attempt to show the application of the statute." 610 S.W.2d at 508.

See also *Griffin v. State,* 665 S.W.2d 762 (Tex.Cr.App.1983). We find no merit to appellant's contention. His ninth and tenth points of error are overruled.

In his eleventh point of error, appellant claims his Sixth and Fourteenth Amendment rights were violated when the trial court refused to appoint a second attorney to aid in his defense. On September 2, 1980, shortly after appellant's arrest, a local attorney, Edward E. Todd, Jr., was initially appointed to represent appellant. Thereafter on November 19, 1980, due to the complexity of the case, Jack V. Strickland of Fort Worth was appointed to replace Todd. On December 30, 1980, appellant filed a motion requesting the appointment of a second attorney due to the fact that the State would be represented by two highly qualified and experienced counsel during the trial, the trial of both the capital murder and the attempted murder charges would probably be extremely lengthy and time-consuming and also the failure to appoint additional counsel would deny him equal protection under the law and subject him to a "trial by economics," since he lacked the ability to hire additional counsel to match the State's funding for trial. The trial court denied this request but did tell Strickland that although he would not make a formal appointment and commit State funds for additional attorney's fees, he would allow Strickland to have anyone sit with him at the counsel table that he wanted. On January 16, 1981, the court appointed local attorney Nolan Queen to consult with Strickland concerning the voir dire of the jury panel.

Appellant acknowledges this Court's ruling in *Sanne v. State,* 609 S.W.2d 762, 776 (Tex.Cr.App.1980), wherein we held that the appointment of a second attorney is not mandated in a capital case. However, he urges us to adopt the holding of *Keenan v. Superior Court,* 31 Cal.3d 424, 180 Cal. Rptr. 489, 640 P.2d 108 (1982). In *Keenan,* the California Supreme Court held that there is:

"... a constitutionally mandated distinction between death and other penalties, [that] requires that the trial court apply a higher standard than bare adequacy to a defendant's request for additional counsel. If it appears that a second attorney may lend important assistance in preparing for trial or presenting the case, the court should rule favorably on the request. Indeed, in general, under a showing of genuine need, and certainly in circumstances as pervasive as those offered by the attorney in this case, a presumption arises that a second attorney is required." 180 Cal.Rptr. at 494, 495, 640 P.2d at 113, 114.

Appellant lists eight factors which he alleges show that a genuine need for a second attorney existed and ask that we apply the presumption adopted by the California court. The eight factors include:

(1) the single appointed attorney was from out of county,

(2) an early court date was set just two months hence,

(3) the inherent problems of simultaneous preparation of guilt/innocence and punishment phases of the trial,

(4) the complexity of factual and legal issues,

(5) the high visibility of the case necessitating preparation of a change of venue motion and hearing,

(6) the necessity for numerous pre-trial motions,

(7) the denial of a motion for an investigator, and

(8) the severity of punishment involved.

Although we decline to adopt the presumption embraced by the California Supreme Court, we certainly agree that a trial court should carefully exercise its dis-

cretion in acting upon an accused's request for additional counsel in a capital murder case. However, a reading of Article 26.04, V.A.C.C.P., which provides for appointment of counsel for indigent defendants, shows that the Legislature did not see fit to draw a distinction between defendants in capital cases versus defendants in noncapital cases. This is important to note in view of the fact that the Legislature did see fit to draw distinctions between the two categories of cases in other procedural areas. Articles 35.15(a), 35.17(2) and 37.071, V.A.C.C.P.

■ As far as any constitutional argument, it appears that a defendant is entitled to reasonably effective assistance of counsel and no more. Therefore we hold that constitutional error occurs as a result of the failure to appoint additional counsel only if the accused did not receive the reasonably effective assistance of counsel to which he was entitled under the Sixth and Fourteenth Amendments. *Sanne v. State*, supra; *Aranda v. State*, 640 S.W.2d 766, 771 (Tex.App.—San Antonio, 1982, no petition).

The record in the instant case shows that appellant was represented by a skilled and experienced criminal attorney. Counsel was an aggressive and able advocate throughout the proceedings. Appellant has failed to show that he did not receive effective assistance of counsel. Thus we find that the trial court did not abuse its discretion in denying appellant's motion for additional counsel. This point of error is overruled.

In his twelfth and thirteenth points of error appellant argues that reversible error occurred when the trial court improperly intervened in the voir dire examination of prospective juror Floyce Addison in violation of Article 35.17, V.A.C.C.P., and when the trial court refused to allow appellant voir dire examination of Addison.

The record shows that prior to turning Addison over for voir dire examination by the parties, the trial judge as was his practice, engaged in some preliminary remarks. He first introduced Addison to the attorneys, the defendant and the court reporter.

He then explained to her the purpose of the voir dire examination and then told her of the possibility of being sequestered if she should be picked for the jury. Through further questioning he determined that she had read a considerable amount about the commission of the offense in at least two newspapers. He then read the V.T.C.A., Penal Code, Section 12.31(b) oath to her and asked if there were any reason she could not take the oath. She replied that she did not feel she could sentence someone to death. As with the other prospective jurors, the trial judge then turned Addison over to the State for its voir dire examination. The State began its examination by asking Addison whether she had formed a conclusion as to the guilt or innocence of the appellant as a result of the information she had read in the newspaper.

"Q. Ms. Addison, I want to ask you a few questions about what you and the Judge have just been discussing concerning some of the facts that you know about this case, and I just need to inquire first of all, whether or not as a result of the things that you've told the Judge about this case that you know about, whether you've established in your mind any conclusion as to the guilt or innocence of the Defendant charged with the crime in this case.

"A. Yes, I think I have.

"Q. Okay. Could you be more specific? You see, this is an area where you need to be as specific as you can be, and I understand that—I understand what you're saying there, but if you can be more specific, then it would be helpful.

"A. In other words, do I think there is a guilty or a not guilty—

"Q. Yes, ma'am. I am not permitted by law to ask you which way you feel. I am permitted by law to inquire as to whether or not you have formed an opinion about the guilt or innocence of the Defendant in a criminal case prior to hearing any evidence.

"A. No, not really.

"Q. You haven't established in your mind, in other words, any conclusion as

to the guilt or innocence of this Defendant?

"A. (Venireman Addison nods her head in the negative.)

"THE COURT: You need to speak out loud.

"VENIREMAN ADDISON: No, sir.

"Q. (By Mr. Smith) Your answer is no to that?

"A. Yes. No.

"Q. Do you have any opinion as to the guilt or innocence of this Defendant in this case?

"A. Well, no, I don't."

At this point the trial court interrupted the prosecutor's examination and attempted to get Addison to clarify her answers:

"THE COURT: I think what Mr. Smith is saying—you gave a rather detailed account of what you had read, and his questions go towards the fact that as a result of having read that, have you formed an opinion about the case and about this Defendant as to whether or not he committed the offense for which he stands charged as a result of having read something about it?

"VENIREMAN ADDISON: Well, yes, I have.

"THE COURT: Let me—I'm not sure if I told you this or anyone has, Ms. Addison. There is no right or wrong answers this morning.

"VENIREMAN ADDISON: I see.

"THE COURT: In other words, you don't try to answer something the way that you think somebody wants you to answer it.

"VENIREMAN ADDISON: I see.

"THE COURT: You just answer out of the way your heart and mind might tell you and the way you feel about it and no one will have any qualm with you about that. Now, I thought that that was your answer first and then later, it seemed not to be your answer.

"VENIREMAN ADDISON: Yeah.

"THE COURT: Now, you do feel—do I understand you to say that as a result of what you have read, as you are seated here this morning, that you have established in your mind some opinion as to the guilt or innocence of the Defendant?

"VENIREMAN ADDISON: Yes. Yes, I do.

"THE COURT: As a result of that opinion, have you arrived at a conclusion that would influence your verdict if you were selected as a juror in this case?"

At this point defense counsel objected to the trial court injecting itself into the voir dire examination. The trial court noted that it was just attempting to help Addison understand what was being asked of her. The trial court then instructed the State to continue with its voir dire examination. The State then asked Addison if her conclusions as to the defendant's guilt would influence her in reaching a verdict in the case. When she replied in the affirmative, the State passed Addison to the defense for further examination. The trial court then stated:

"THE COURT: I believe that if I understand the law correctly, unless you have some objection Mr. Strickland, as a result of the answers that have been given, further Voir Dire would be improper.

"MR. STRICKLAND: I think it is improper, Judge, and the only thing I can do is ask leave of the Court to do that and see whether or not the State objects."

Thereafter a conference at the bench ensued:

"THE COURT: Do I understand you would want to take her on Voir Dire?

"MR. STRICKLAND: Yes, sir.

"THE COURT: Unless the State objects?

"MR. CARNEY: Your Honor, at this time, the State would enter a Challenge for Cause to this prospective juror under the provisions of Article 35.-16 and ask that no further Voir Dire examination be conducted because the status quite clearly—

"THE COURT: I believe, based on the answers given, that Challenge for Cause would be proper.

"MR. STRICKLAND: Of course, I acknowledge what the statute says in an ordinary case and would not object to not having an opportunity to Voir Dire, but given the fact that she gave ambivalent answers or ambiguous answers and further due to the fact that the Court, once answers had been received in response to the State's questions, the Court interjected itself into the Voir Dire, I would object to not being entitled to take her. I think everyone has had a shot at her except me, and for those reasons, I would object, but I understand the Court's ruling."

The court then excused Addison for cause. Thereafter defense counsel again reiterated his objection to the manner in which the voir dire examination of Addison had been conducted and read into the record a number of questions he would have posed to the prospective juror had he been allowed to examine her.

At the time of trial, Article 35.16(a), V.A.C.C.P., provided in pertinent part that a challenge for cause could be made by either the State or the defense for the following reason:

"9. That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. *If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court.* If he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay, and if the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case. If the court, in its discretion, is not satisfied that he is impartial, the juror shall be discharged; ..." (emphasis added)

▇▇ Regarding appellant's contention that he should have been able to question the prospective juror, we find that the statute is unmistakably clear on the procedure to be followed. Once the prospective juror has indicated that his opinion as to guilt or innocence will affect his verdict, all questioning must cease and the juror must be discharged. We find the court acted properly in the instant case in refusing to allow defense counsel to voir dire Addison on this point.

The cases cited by appellant in his brief, *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981) and *Rougeau v. State*, 651 S.W.2d 739 (Tex.Cr.App.1982), are inapplicable to this point in that they deal with giving the defense an opportunity to rehabilitate a prospective juror after the individual has indicated an inability to impose the death penalty. These cases do not deal with the situation covered by Article 35.16(a)(9), supra, and are therefore inapplicable to the case at bar.

As noted above appellant also argues that the court acted improperly in violation of Article 35.17(2) by intervening in the voir dire examination after it had completed its preliminary remarks and had turned the prospective juror over to the State for questioning. Article 35.17, supra, provides in pertinent part that:

"2. In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."

Appellant argues that since the statute makes no provision for examination of a prospective juror by the trial court beyond initial questioning regarding points of law, any further examination by the trial court constitutes reversible error. We disagree. Read literally, the statute does not prohibit additional questioning by the trial judge and we do not infer such a prohibition. In countless cases before this Court, we have seen the trial judges intervene in voir dire examinations. Usually such intervention is warranted for purposes of clarification and expedition and we have implicitly approved this practice time and time again. *Enriquez v. State*, 429 S.W.2d 141 (Tex.Cr.App.1968). See also: *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr.App.1982). Only when a trial court's comments during voir dire are reasonably calculated to benefit the State or prejudice the defendant's rights will reversible error occur. *Price v. State*, 626 S.W.2d 833 (Tex.App.—Corpus Christi, 1981, no petition). We find no such error in the instant case. Appellant's twelfth and thirteenth points of error are overruled.

In his final point of error, appellant contends that the trial court impermissibly restricted his voir dire examination of prospective juror Kathleen Burrows.

The record shows that during the prosecution's voir dire examination Burrows was asked if she could consider probation as a punishment for murder. She initially responded that she did not think she could consider probation. At this point the trial court intervened and explained the difference between granting and considering probation. When the court asked Burrows if she could consider probation, she then replied that she would have to give it consideration. When defense counsel questioned Burrows about probation, the following occurred:

"Q. Ms. Burrows, something that you said when you were speaking with Mr. Smith caused me a little bit of concern when he was talking to you about the issue of probation and whether or not you felt that you would be able to give fair consideration to a Defendant's application for probation when you had found him guilty of murder; and that was that you said that you would, quote, have to give the consideration. Do you remember saying that?

"A. Yes.

"Q. Okay. The part of that answer that concerns me is where you say, 'I would have to give it consideration.' Could you tell me kind of what you mean by that?

"A. Well, it just seems that anybody that's—has been proved to commit something that serious, it seems like a serious thing to just—for a person to just not have any punishment—

"Q. Uh-huh.

"A. —and I guess that's what I—that's just how I feel. I don't know how else to answer you.

.    .    .    .    .

"Q. Does that fact, that is, the question of probation in a case in which you'd found a person had intentionally killed another human being—do you have some feeling against the granting of probation in that instance?

"A. Well, yes, it would bother me a lot. I wouldn't—I wouldn't think that would be fair. It doesn't seem fair.

.    .    .    .    .

"Q. All right. Is your feeling about probation and about the necessity for punishing people that have engaged in criminal law violations—does that cause you in any way to be predisposed toward putting somebody in jail as opposed to leaving them on the streets in probation?

"A. Well, yes. I guess it would; but I believe I was asked earlier if I could live with—or if I could accept the possibility of a probation. I'm, probably getting mixed up here.

"Q. No, no, you're doing fine.

"A. If the evidence was such that you just couldn't put a person in jail or—then I could. I'd have to honestly say I wouldn't want to, you know; just my own personal feelings, but if the evi-

dence was not sufficient, then I guess a person would have to.

"Q. Okay.

"A. And I would have to abide by what was given in evidence.

"Q. All right, as you sit here now, without knowing any facts or having heard any evidence, you would not want to put somebody—to put a murderer on probation?

"A. No.

.    .    .    .    .

"Q. Because of your feeling about not wanting to put a murderer on probation as you sit here right now, would it take some evidence over and above the mere application for probation to cause you to change your mind? Some evidence from the Defendant, for example, to cause you to change your mind and to put a Defendant on probation?"

The State objected to this question and in a lengthy interchange the trial court admonished defense counsel that these questions were not proper in that they did not concern matters relevant to Burrow's qualifications as a juror regarding the question of whether or not she could *consider* probation as a punishment for the offense of murder. Defense counsel then continued with his voir dire examination:

"Q. Now, in regard to the question of evidence, let me ask you whether or not you would require evidence from the Defendant in regard to that issue or any other issue in the trial of the criminal case?"

The court intervened and asked defense counsel to explain if he was asking the juror if she would require evidence in order to *consider* probation or to *grant* probation. Thereafter the following occurred:

"BY MR. STRICKLAND

"Q. Let me ask you whether in a criminal case, Ms. Burrows, you would ever, in regard to the issue of probation or the granting of probation or the considering of probation, require some evidence from the Defendant—

"THE COURT: Now, Mr. Strickland—...—you've thrown them both in there, now. you said either in grant-

ing or considering. I think she's entitled to have them broken down in separate issues.

"MR. STRICKLAND: Judge, I believe the effect of the Court's ruling is that I can make no further inquiry in regard to the issue—

"THE COURT: That's not what I'm telling you.

At that point defense counsel ceased his questioning regarding probation. He then explained to Burrows that a defendant did not have to offer any evidence whatsoever in his behalf. When he asked Burrows what she thought of that law, she replied that although she did not think it was a good law, she would abide by the law. Finally, defense counsel asked Burrows if she could be a fair and impartial juror. Burrows told the defense attorney that she would try to be a fair and impartial juror. She concluded her remarks by stating that it would be difficult to be fair because of the seriousness of the case but she would try. When the defense attorney asked her to elaborate on what would be difficult for her, the State objected on the ground of relevancy and the court sustained the objection. The following then occurred:

"MR. STRICKLAND: Judge, is the Court cutting me off from an inquiry when she says it would be difficult to be fair in a death penalty case?

"THE COURT: If you have some other questions that you want to ask—

"MR. STRICKLAND: I would like to ask—

"THE COURT: I don't think it's a proper question. I've sustained the objection to the way it was phrased.

"MR. STRICKLAND: Please note our exception, Judge. Judge, based on the court's rulings, I have no further questions."

Immediately thereafter the State accepted Burrows as a juror but the defense exercised a peremptory challenge. Defense counsel then asked the judge to grant the defense an additional peremptory strike in that the trial judge had unduly restricted the voir dire examination of Burrows. The

court replied that it did not consider sustaining an objection to a question as a limitation on voir dire and thus the request for an extra peremptory strike would be denied.

Appellant argues that the trial court impermissibly restricted his voir dire examination in the areas of consideration of an accused's eligibility for probation and Burrow's ability to be a fair and impartial juror. He argues that this limitation of his voir dire examination hindered his ability to intelligently exercise a challenge for cause and, in the alternative, a peremptory challenge.

We note initially that at the end of the voir dire examination of the entire panel, appellant had one remaining peremptory strike. Inasmuch as appellant did not exhaust his peremptory strikes and was not forced to accept an objectionable juror, any error was rendered harmless. *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980); *Emanus v. State,* 526 S.W.2d 806 (Tex.Cr. App.1975). Furthermore, it is clear from the record that the trial court did not limit appellant's voir dire in proper areas of questioning. Rather the court clearly told defense counsel that he was not limiting questioning in these areas but was only sustaining objections to the particular form of defense counsel's questions. We find no abuse of discretion by the trial judge. This point of error is overruled.

The judgment is affirmed.

DUNCAN, J., concurs in the result.

CLINTON, J., dissents to disposition of the fourth point of error because appellant's right to *effective* assistance of counsel was denied in that counsel did not receive adequate notice of *when* an examination would be conducted.

TEAGUE, J., dissents.