

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-124-CR**

ROBERT ALLEN BYRD                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Robert Allen Byrd appeals his conviction for engaging in organized criminal activity.[2]  In two points, Appellant argues that the evidence is insufficient to support the jury's verdict and that the trial court erred by overruling his motion for change of venue.  We will affirm.

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Penal Code Ann. § 71.02 (Vernon 2007).

## II. BACKGROUND

Appellant, a resident of Johnson County, is a confessed former high-ranking captain of a white-supremacist group who call themselves the Aryan Circle. In May 2006, Appellant had gone to Hood County, Texas, to "hold court"[3] on a fellow Aryan Circle member, Shawn Goodrich. The court involved allegations surrounding Goodrich's extensive use of methamphetamine and Goodrich being behind on his payments for the illegal drug.

After having conducted court regarding Goodrich, Appellant, Johnny Freeman, Daniel Roof—a lieutenant in the Aryan Circle, Jennifer Perez, and Goodrich went to a Granbury convenience store to meet Ruth Adkins and her son James Newell. Adkins was upset that her daughter, Jennifer Newell, had begun shooting methamphetamine with her boyfriend, James Padgett. Adkins believed that Padgett would get her daughter to use the drug so that she would pass out and he would then do "sexual things" with her.

Shortly after this meeting, Appellant, Freeman, Roof, Goodrich, and Perez drove to Oak Trail Shores, a Granbury subdivision. On the way, Appellant talked about going to Jennifer Newell and Padgett's house because Padgett

---

[3] "Holding court" refers to fellow Aryan Circle members holding another member accountable for violating the Aryan Circle's "handbook" and often involves physical punishment for the offender.

2

was "spinning Jennifer out."[4]  When the group got to Padgett's house, Jennifer answered the door and told them that Padgett was not home, so the group left. On their way out of the Oak Trail Shores neighborhood, they saw Padgett entering the gates and turned around.  After stopping Padgett's vehicle, Appellant, Roof, and Freeman jumped out of the truck.  Appellant and Roof allegedly had knives with them.  About five minutes later, the three returned to the truck with blood on them and breathing heavily.  As they left the scene, Appellant used a stuffed animal in the truck to wipe the blood off his arm and knife.  Roof cleaned his knife with beer.  They then threw the bloodied toy, as well as the knives, out of the truck window.

As they left the scene, Freeman was allegedly upset, saying that what had occurred "was sloppy" and that the attack "wasn't suppose[d] to go down like that."  Appellant replied, "It's all right.  I got him.  We don't have nothing to worry about."  Roof complained that he was able to "do nothing" because his knife was dull.  The group then drove to Dallas, where they purchased new clothes at a Wal-Mart.  The three men changed their clothes at a truck stop and discarded their bloody clothes into the truck stop's trash bin.

---

[4] "Spinning out" is vernacular used to describe the state of being high on methamphetamine to the point of unconsciousness.

3

Freeman's girlfriend, Amber, returned home late that afternoon and found that Freeman was not home. She called several people, including Adkins, looking for Freeman. Adkins told Amber that there had been a stabbing in Oak Trail Shores and that the police thought Freeman was involved. Shortly thereafter, Adkins called Amber and asked her to meet her at Brazos River Acres. Once there, Adkins told Amber that Freeman wanted to meet them in Hillsboro, Texas.

Adkins and Amber drove to Hillsboro, where they met Appellant and Freeman at a gas station. Amber noticed that the men were wearing different clothes than they had been wearing earlier. Adkins rented a nearby motel room, where the four of them went to talk.

At trial, Amber testified that Appellant said he had stabbed Padgett because God told him to and that he was freeing Jennifer Newell from Padgett. Appellant described how it "felt good" to stab Padgett. According to Amber, Freeman appeared shocked while Appellant and Adkins appeared pleased.

Padgett was airlifted to Harris Methodist Hospital in Fort Worth after the stabbing. Having suffered massive blood loss, he underwent surgery to repair multiple stab wounds in his heart and his torso. He was eventually transferred to a nursing home facility, where he died of pneumonia nearly a year later. The

4

medical examiner listed Padgett's cause of death as complications from multiple stab wounds.

A Hood County grand jury indicted Appellant in July 2007. The indictment specifically charged that Appellant, on May 6, 2006, "did then and there, with the intent to establish, maintain, or participate as a member of a criminal street gang, commit Aggravated Assault by stabbing James Padgett with a knife . . . ." On March 27, 2008, a jury found Appellant guilty of engaging in organized criminal activity. The jury sentenced Appellant to ninety-nine years in prison and assessed a $10,000.00 fine. This appeal followed.

### III. DISCUSSION

**A.       Sufficiency of the Evidence**

In his first point, Appellant argues that the "evidence is insufficient to establish the elements of engaging in organized criminal activity because only one crime was committed." Appellant does not specify whether his challenge is to the legal sufficiency of the evidence or its factual sufficiency, or both. Although this court has the authority to review factual sufficiency in criminal cases, we may do so only if the issue is "properly raised." *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). A factual sufficiency point is properly raised only if it is specified in a separate point, sets out the proper standard of review, and analyzes why the facts fall short of that standard. *See*

5

*id.; see also Patterson v. State*, 46 S.W.3d 294, 305 (Tex. App.—Fort Worth 2001, no pet.); *Moon v. State*, 44 S.W.3d 589, 593 (Tex. App.—Fort Worth 2001, pet. ref'd).  Appellant does not discuss in his brief a separate point pertaining to factual sufficiency of the evidence, nor does he discuss the applicable standard, analyze any disputed material facts, or attempt to explain why the evidence supporting his conviction is factually insufficient.  Because we construe this point only as a challenge to the legal sufficiency of the evidence, we will conduct only a legal sufficiency review.  *See Cardenas v. State*, 30 S.W.3d 384, 386 n.2 (Tex. Crim. App. 2000) (conducting only a legal sufficiency review where defendant, despite having requested "[i]n a single sentence at the conclusion of his [sufficiency of the evidence] point of error . . . that [the court] conduct a factual sufficiency review," otherwise made no reference to the factual sufficiency of the evidence nor the applicable standard); *Chavero v. State*, 36 S.W.3d 688, 693 (Tex. App.—Corpus Christi 2001, no pet.) (conducting only a legal sufficiency review where defendant argued only that his "conviction should be vacated and a judgment of acquittal entered because there was insufficient evidence to establish all of the necessary elements" of the offense but failed to reference factual sufficiency or the applicable standard of review).

### 1. Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### 2. Engaging in Organized Criminal Activity

A person commits the offense of engaging in organized criminal activity if, "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang," he commits or conspires to commit one or more specified offenses, here, aggravated assault. Tex. Penal Code Ann. § 71.02(a)(1) (Vernon Supp. 2008). The Texas Penal Code defines "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *Id.* § 71.01(d) (Vernon 2003).

Under the plain language of section 71.02(a), a defendant is guilty of engaging in organized criminal activity when the State proves the first element—that the defendant committed a specific offense that is listed under that chapter, such as aggravated assault, and the second element—that the

defendant committed that offense "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang." *Id.* § 71.02(a)*; Curiel v. State,* 243 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Appellant argues that the evidence is insufficient to prove the elements of engaging in organized criminal activity "because only one crime was committed." Appellant then details the evidence demonstrating the aggravated assault on Padgett. Appellant concludes that the evidence "indicates at best that one criminal activity occurred as a group activity, and therefore the evidence does not support the conviction." Thus, we interpret Appellant's sufficiency of the evidence argument as challenging the second element only—whether he committed an offense "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang," and he does not challenge the first element, whether he committed the underlying offense of aggravated assault.

The evidence shows that the assault on Padgett was retaliation for Padgett's having gotten James Newell's sister, Jennifer, addicted to methamphetamine and—by Appellant's own admission—for Padgett's having disrespected the Aryan Circle gang. The State presented evidence that James Newell, Freeman—one of the five-member group that sought out and found Padgett—and Appellant share white-supremacist views. The State also

8

presented evidence that Appellant was a high-ranking official of the Aryan Circle, a gang that regularly dealt in illegal narcotics, weapons, racketeering, and identify theft. There was testimony presented at trial by a Texas Department of Criminal Justice officer that it is common for Aryan Circle gang members to take care of other gang members' families.

Appellant confirmed that he was a captain in the Aryan Circle. Roof, the other attacker, was identified as a lieutenant in the Aryan Circle. Appellant also confirmed that Goodrich, one of the group that sought out Padgett the night he was assaulted, was also a member of the Aryan Circle. Appellant stated that his responsibility as captain was to make sure all members followed the gang's guidelines. Members were expected to obey his orders. Appellant admitted that his gang regularly assaulted members who desired to get in or out of the gang. Although he denied that the gang sanctioned drug sales, Appellant admitted that Goodrich, James Newell, and Freeman were all involved in the drug trade.

Aaron Jostmeyer, Appellant's friend, testified that in the summer of 2006, Appellant told him that he was worried that the police might be looking for him because of "a hit" he had done in Hood County. Jostmeyer said that Appellant told him the "hit" was in retaliation for Padgett's getting "girls strung out on heroin and raping them." Jostmeyer stated that Appellant told him that

he had apologized to Jennifer Newell—James Newell's sister and Padgett's girlfriend—for stabbing Padgett but that it "had to be done."

Viewing this evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have determined beyond a reasonable doubt that Appellant committed the underlying aggravated assault on Padgett with the intent to participate as a member of the criminal street gang, Aryan Circle. *See* Tex. Penal Code Ann. § 71.02(a); *Roy v. State*, 997 S.W.2d 863, 869 (Tex. App.—Fort Worth 1999, pet. ref'd). We overrule Appellant's first point.

### B. Motion for Change of Venue

In his second point, Appellant argues that the trial court erred in overruling his motion for change of venue. We disagree.

Section 31.03(a) of the code of criminal procedure provides that a change of venue may be granted if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." Tex. Code Crim. Proc. Ann. art. 31.03(a) (Vernon 2006). To justify a change of venue based upon media attention, a defendant must show that the publicity was pervasive, prejudicial, and inflammatory. *Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). Widespread publicity, by itself, is not considered inherently prejudicial.

10

*See Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007); *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996). Indeed, even extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage. *Faulder v. State*, 745 S.W.2d 327, 338–39 (Tex. Crim. App. 1987). The mere existence of media attention or publicity is not enough, alone, to merit a change of venue. *Bell*, 938 S.W.2d at 46.

The standard of review on appeal from a ruling on a motion for change of venue is abuse of discretion. *Gonzalez*, 222 S.W.3d at 449. If the trial court's decision concerning a motion for a change of venue falls within the zone of reasonable disagreement, it will be upheld. *See Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992); *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g); *Penry v. State*, 903 S.W.2d 715, 727 (Tex. Crim. App. 1995). The two primary means of discerning whether publicity is pervasive are a hearing on the motion to change venue and the voir dire process. *Gonzalez*, 222 S.W.3d at 449. The trial court in this case used both.

At the hearing, the State introduced two exhibits—the affidavits of two Hood County citizens asserting that Appellant could receive a fair trial. Appellant introduced into evidence a Hood County newspaper's May 10, 2006

11

article regarding the stabbing of Padgett—which does not mention Appellant—and several other various newspaper articles referencing Appellant's arrest that mention Appellant by name. But there was no evidence presented of how many times these media reports were circulated or how many people actually read these articles. *See id.* Appellant also introduced into evidence a DVD copy of a program that ran on Granbury's educational access television channel after the stabbing had occurred, titled "District Judge Report." On this program, the trial judge is reported as having referred to members of the Aryan Brotherhood as "bad dudes" and, although never referring to Appellant by name, described one of the assailants in this case as a "cold-blooded killer."

Although this particular report might have contained potentially inflammatory statements, Appellant failed to show that the program pervaded the community or influenced the panelists. In fact, as evidenced by answers in voir dire, none of the panelists had watched the program containing the potentially prejudicial interview.

Appellant argues that because the trial judge has great influence in the community from which the jury panel is formed, Appellant could not have received a fair trial. This conclusion, however, does not comport with existing case law. *See Gardner v. State*, 733 S.W.2d 195, 204–05 (Tex. Crim. App. 1987); *see also Taylor v. State*, 420 S.W.2d 601, 604 (Tex. Crim. App. 1967),

12

*overruled on other grounds*, *Jackson v. State*, 548 S.W.2d 685, 690 n.1 (Tex. Crim. App. 1977). In *Gardner*, the court of criminal appeals held that even though fifteen of the seventy-seven potential jurors were excused because they had formed conclusions due to media coverage concerning the defendant's guilt, that, in and of itself, did not demonstrate the inability of the defendant to be tried by an impartial jury. *Gardner*, 733 S.W.2d at 204. Likewise, in *Taylor*, voir dire examination indicated that approximately thirty-nine of the 112 potential jurors questioned held an opinion that the defendant was guilty due to media coverage. *Taylor*, 420 S.W.2d at 604. The court of criminal appeals held in both cases that it was not an abuse of discretion by the trial judge to deny the venue-change motions. *Id*. at 606; *Gardner*, 733 S.W.2d at 206.

In this case, the trial court received the documentary evidence and reviewed the DVD before the pretrial hearing, and it heard the responses of the jurors at voir dire. This court affords great deference to trial courts because a trial court is in a better position to resolve issues involving testimony and other questions of fact as a result of its ability to observe the demeanor of witnesses and scrutinize their veracity face to face. *See Hathorn v. State*, 848 S.W.2d 101, 109 (Tex. Crim. App. 1992) (holding that the trial judge must act as factfinder with regard to issues presented on motion for change of venue). We see nothing in this record other than the DVD to distinguish this case from

13

numerous others in which a trial court's denial of a motion to change venue has been upheld. That sole distinguishing characteristic is not sufficient to place beyond the zone of reasonable disagreement the trial court's decision to believe the jury panel's members when they said they had not seen the program which contained the trial judge's comments and to deny Appellant's motion. We hold that the trial court did not abuse its discretion in denying Appellant's motion and overrule his second point.

## IV. CONCLUSION

Having overruled both of Appellant's points, we affirm the trial court's judgment.

PER CURIAM

PANEL: WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment); LIVINGSTON and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 12, 2009

14