REVISED May 15, 2000

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-40064
_____

MIGUEL ANGEL FLORES,

Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
For the Eastern District of Texas

_____

April 20, 2000

Before HIGGINBOTHAM, EMILIO M. GARZA, and BENAVIDES, Circuit
Judges.

PER CURIAM:

Miguel Angel Flores seeks habeas relief on two grounds.[1]
First, he urges that he did not receive effective assistance of
counsel during the guilt and penalty phases of his trial. Second,
he urges that his conviction should be reversed for failure of the

_____

[1] The petition was filed in the district court on April 22,
1996. The AEDPA became effective on April 24, 1996, and does not
control the case.

Our colleague expresses concern over the admissibility of
expert testimony regarding the issue of future dangerousness.
Flores has been ably represented on this appeal and counsel have
not claimed that the judgment should be reversed because this
testimony was admitted in the state trial. And properly so. It is
clear that any error was not of a constitutional magnitude under
the settled law of the Supreme court and this court. It is the
inescapable fact that a lay jury is asked to judge future
dangerousness. We cannot then reject as constitutionally infirm
the admission into evidence of the same judgment made by a trained
psychiatrist.

state to advise Flores of his right to inform Mexican consular officials of his arrest and detention and to be informed of his rights under the Vienna Convention on Consular Relations, April 23, 1963, TIAS 6820, 21 U.S.T. 77, 596 UNTS 261. The district court denied relief.

I

We reject the claims of ineffective assistance of counsel for essentially the reasons found by the district court.

II

The United States Senate ratified the Vienna Convention on December 24, 1969. At that time, the provisions of the Convention became binding on the individual states. U.S. Const. arts. VI, cl. 2; art. II, § 2, cl. 2. The Vienna Convention provides:

> if he so requests, the competent authorities of the receiving State shall, *without delay*, inform the consular post of the sending state if, within its consular district, a national of that state is arrested or committed to prison or to custody pending trial *or is detained in any other manner*. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities *shall inform the person concerned without delay of his right under this sub-paragraph*.

21 U.S.T. 78, Apr. 23, 1963, art. 36(b) (emphasis added).

On his arrest and interrogation, Flores was not advised of his rights under the Convention. It appears to be undisputed that officials were aware of his citizenship. Flores urges that a failure to abide by the terms of the Convention is structural error and hence he need not demonstrate that the violation prejudiced his right to a fair trial; that there is no harmless error analysis for

2

structural defects. Alternatively, Flores urges that the "violation" of the Convention "seriously harmed" him. The argument continues that while in custody, Flores was "compelled to make four tape recorded statements" without an attorney, that had the consulate been informed of his rights, the consulate would have obtained a Spanish speaking attorney for him. The State replies that Flores has lived his life in the United States, was educated in its public schools, and his first language is English. Further, that he did not want assistance.

At the outset we must confront the question of whether the Vienna Convention conferred rights enforceable by individuals. Here Flores points to our decision in Faulder v. Johnson, 81 F.3d 515 (5th Cir. 1996). In Faulder we observed that there had been a violation of Faulder's Vienna Convention rights. However, the panel found the omission to be "harmless error," which did not merit reversal:

> [T]he district court correctly concluded that Faulder or Faulder's attorney had access to all of the information that could have been obtained by the Canadian government. While we in no way approve of Texas' failure to advise Faulder, the evidence that would have been obtained by the Canadian authorities is merely the same or cumulative of evidence defense counsel had or could have obtained.

We do not read our opinion in Faulder as recognizing a personal right under the Convention. Rather, the panel dispatched the claim with its conclusion that any violation was harmless. Any negative implication inherent in rejecting the claim as harmless lacks sufficient force to support a contention that the panel held that the Convention created rights enforceable by individuals.

3

While we conclude that Faulder has not decided the question, we do not reach its merits because at best Flores's assertion is Teague barred.

The Supreme Court in Breard v. Greene, 118 S. Ct. 1352, 1355 (1998), noted that "[t]he Vienna [C]onvention . . . arguably confers on an individual the right to consular assistance following arrest." Thus, even the Court admits the possibility that the Vienna Convention does not confer such rights, and therefore, such a finding would create a new exclusionary rule, which is prohibited in a collateral habeas attack because of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989). See Breard, 118 S. Ct. at 1354-55 (holding that the Vienna Convention must be applied "in conformity with the laws and regulations" of the United States, including the rules for federal habeas relief).

AFFIRMED.

EMILIO M. GARZA, Circuit Judge, specially concurring.

As the majority opinion notes, the district court carefully considered, and denied, Flores's ineffective assistance of counsel claim. I do not disagree with the district court's thoughtful and well-reasoned opinion; it is an inevitable consequence of the relevant precedent in this area of the law, and we could add little to its fine analysis. However, I write separately to raise questions about the authority on which that opinion is based, which appears inconsistent with itself and, possibly, with the dictates of the Constitution.

When one considers the conduct of Flores's trial attorney, Gene Storrs, it takes little inquiry to determine that this case is troubling. Based on overwhelming evidence, Mr. Storrs's chances of convincing the jury of Flores's innocence were minimal. Storrs's only chance of successfully defending Flores was to limit the applicability of the death penalty. In this regard, the best mitigating evidence Storrs had was Flores's complete lack of a criminal, juvenile, or psychiatric record, evidence which directly mitigated against Flores's alleged "future dangerousness." Inexplicably, Storrs failed to elicit such evidence; in effect, he failed to elicit any evidence in mitigation. *But see infra* note 8 (describing Storrs's cross-examination of Dr. Clay Griffith).

In and of itself, Storrs's failure in this regard may not have been as devastating but for Dr. Clay Griffith's testimony, which condemned Flores to death based on an "objective" evaluation. Before testifying unequivocally that Flores would be a "future danger," Dr. Griffith never examined Flores, nor did he make his evaluation based on psychological records or psychological testimony. Rather, he sat at trial, and based on the facts of the offense and Flores's conduct during the trial (Flores did not testify), Dr. Griffith came to an "expert" opinion on Flores's future dangerousness.

Such testimony lacking objective scientific testing or personal examination defies scientific rigor and cannot be described as expert testimony. It is simply subjective testimony without any scientific validity by one who holds a medical degree. Given the paucity, indeed the complete lack,

5

of mitigating evidence presented in this case, Dr. Griffith's testimony virtually compelled the jury's answer to the second special issue.[2] In short, the truly troubling facet of this case is the sole evidence upon which the jury found Flores to be a future danger: the testimony of a doctor who had never met the defendant.

## I.

While permitted by the Constitution, *see Gregg v. Georgia*, 428 U.S. 153, 177, 96 S. Ct. 2909, 2927, 49 L. Ed. 2d 859, __ (1976) (plurality opinion) ("It is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers."),[3] death is a sentence which differs from all other penalties in kind rather than degree. *See Satterwhite v. Texas*, 486 U.S. 249, 262, 108 S. Ct. 1792, 1801, 100 L. Ed. 2d 284 (1988) ("The awesome severity of a sentence of death makes it qualitatively different from all other sanctions."). Death is the most final, and most severe, of punishments. *See Gregg*, 428 U.S. at 187, 96 S. Ct. at 2931, 49 L. Ed. 2d at __ ("There is no question that death as a punishment is unique in its severity and irrevocability.").

Accordingly, while the Eighth Amendment allows the death penalty as an appropriate response to especially egregious crimes, it also strictly regulates the procedures by which death sentences are imposed and reviewed. *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2957, 57 L. Ed. 2d 873, __ ("[T]he qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); *Caldwell v. Mississippi*, 472 U.S.

---

2    As the Court of Criminal Appeals admitted, "the State's case at [Flores'] punishment [hearing], to some extent, rested upon Dr. Griffith's testimony." *Flores v. State*, 871 S.W. 2d 714, 716 (Tex. Crim. App. 1993) (en banc).

3    *See also Callins v. Collins*, 510 U.S. 1141, 1141, 114 S. Ct. 1127, 1127, 127 L. Ed. 2d 435, __ (1994) (Scalia, J., concurring in the denial of certiorari) ("The Fifth Amendment provides that 'no person shall be held to answer for a capital . . . crime, unless on a presentment or indictment of a Grand Jury . . . nor be deprived of life . . . without due process of law.' This clearly permits the death penalty to be imposed, and establishes beyond doubt that the death penalty is not one of the 'cruel and unusual punishments' prohibited by the Eighth Amendment.").

6

320, 329, 105 S. Ct. 2633, 2639-40, 86 L. Ed. 2d __ (1985) (asserting that the need for reliability in death sentences "requires a correspondingly greater degree of scrutiny of the capital sentencing determination"). Sentencing procedures for capital crimes, far more so than for non-capital crimes, must be created and enforced in a way that ensures "that the punishment will [not] be inflicted in an arbitrary and capricious manner." *Gregg*, 426 U.S. at 189, 96 S. Ct. at 2932, __ L. Ed. at __.

Supreme Court jurisprudence guiding consideration of death penalty cases has produced two cardinal principles. First, the "eligibility" phase of a state's capital sentencing scheme))the phase where a state legislature decides which particular homicides could, given sufficiently egregious circumstances, warrant the death penalty))must "provide a meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S. Ct. 1759, 1764, 64 L. Ed. 2d 398, __ (1980) (citations and internal quotation marks omitted); *see also Arave v. Creech*, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542, 123 L. Ed. 2d 188, __ (1993) ("[A] State's capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty . . . [and] must provide a principled basis for doing so.") (citations omitted). Accordingly, under this restriction, a state's capital sentencing scheme must limit a sentencer's discretion to impose the death penalty, in a principled manner, to the most extreme of cases as rationally defined by state law.

Second, however, while in the "eligibility" phase sentencers are only allowed to consider death as a possible punishment in the most severe crimes, sentencers must be allowed during the "selection" phase of a capital sentencing scheme))the phase where a sentencer must decide whether a particular individual found guilty of a potentially capital offense should receive the death penalty))to consider any available evidence which might convince them that any defendant, no matter how severe his offense or reprehensible his past, should not be put to death. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S. Ct. 1756, 1773, 95 L. Ed. 2d 262, __ (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.") (emphasis in original); *Lockett*, 438 U.S. at 604, 98 S. Ct. at 2964,

7

57 L. Ed. 2d at __ ("[T]he sentencer . . . [cannot] be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original); *Jurek v. Texas,* 428 U.S. 262, 271, 96 S. Ct. 2950, 2956, 49 L. Ed. 2d 929, __ (1976) ("A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed."). As the Court held in *McCleskey*, "[a]ny exclusion of the compassionate or mitigating factors stemming from the diverse frailties of humankind that are relevant to the sentencer's decision would fail to treat all persons as uniquely individual human beings." *McCleskey*, 481 U.S. at 304, 107 S. Ct. at 1774, 95 L. Ed. 2d at __ (citations and internal quotation marks omitted).

While states have discretion to structure their capital sentencing system as they please, the Supreme Court has made clear that whatever form they choose, *individualization* of the capital sentencing "selection" hearing is constitutionally mandated. *See Lockett*, 438 U.S. at 605, 98 S. Ct. at 2965, 57 L. Ed. 2d at __ ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."); *Penry v. Lynaugh*, 492 U.S. 302, 317, 109 S. Ct. 2934, 2946, 106 L. Ed. 2d 256, 277 (1989) ("Our decisions subsequent to *Jurek* have reaffirmed that the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty."); *Zant v. Stephens*, 462 U.S. 862, 879, 103 S. Ct. 2733, 2743-44, 77 L. Ed. 2d 235 (1983) ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.") (emphasis in original); *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S. Ct. 869, 875, 71 L. Ed. 2d 1 (1982) ("[T]he fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.") (citing *Woodson v. North Carolina*, 428 U.S. 280, 303-04, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944, __ (1976)); *Romano v. Oklahoma*, 512 U.S. 1, 6, 114

S. Ct. 2004, 2009, 129 L. Ed. 2d 1 (1994) ("States must ensure that sentencing decisions rest on [an] individualized inquiry under which the character and record of the individual offender and the circumstances of the particular offense are considered.") (citations and internal quotation marks omitted); *Buchanan v. Angelone*, 522 U.S. 269, __, 118 S. Ct. 757, 761, 139 L. Ed. 2d 702, __ (1998) ("In the selection phase, we have emphasized the need to allow a broad inquiry into all relevant mitigating evidence to allow an individual determination."). As the Court has made clear, this requirement is not satisfied merely by procedures which categorize a defendant's crime as worthy of execution; rather, what is required is a completely individualized process in which sentencers determine whether imposing death on a particular defendant is a rational and morally appropriate response to the accused's crime and character. *See Enmund v. Florida,* 458 U.S. 782, 801, 102 S. Ct. 3368, 3378-79, 73 L. Ed. 2d 1140, __ (1982) (holding that capital punishment "must be tailored to [the defendant's] personal responsibility and moral guilt"); *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934, __ (1987) (O'Connor, J., concurring) ("[T]he individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant . . . [and] should reflect a reasoned moral response to the defendant's background, character, and crime . . ..").

## II.

The Texas capital sentencing scheme's mechanisms for assuring that the "selection" phase of a capital sentencing hearing involves an invidualized assessment of a defendant's character and crime have been reviewed by the Supreme Court on many occasions.[4] At the time of Flores's conviction,

---

4 *See, e.g., Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976) (finding the Texas procedures constitutional); *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981) (holding that psychiatrist's evaluation of a defendant's 'future dangerousness' implicates the Fifth and Sixth Amendments); *Barefoot v. Estelle*, 463 U.S. 880, 103 S. Ct. 3833, 77 L. Ed. 2d 1090 (1983) (allowing the use of psychological testimony on a defendant's alleged 'future dangerousness'); *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (holding that the sentencing procedure was inadequate in failing to allow jury to give mitigating effect to defendant's mental retardation and

9

once a defendant had been found guilty of a capital felony in a case in which the state of Texas sought

the death penalty, in the "selection" phase, jurors were asked the following two questions:

> Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

> Whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

TEX. CODE. CRIM. P. ANN. art. 37.071(b). If the jury answered affirmatively to the two "special

issues," at the time of Flores's conviction, the court would sentence the defendant to death. *See*

TEX. CODE. CRIM. P. ANN. art. 37.071(g).[5]

---

abusive background); *Franklin v. Lynaugh*, 487 U.S. 164, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988) (holding that the sentencing structure allowed the jury to give mitigating effect to petitioner's prison record); *Johnson v. Texas*, 509 U.S. 350, 370, 113 S. Ct. 2658, 2670, 125 L. Ed. 2d 290, __ (1993) (holding that the second special issue allowed jurors to adequately consider the youth of an accused murderer as mitigating evidence).

5     In *Penry*, the Supreme Court held the Texas "special issues" unconstitutional as applied because the 'future dangerousness' inquiry did not allow the jury to consider the defendant's mental retardation and violent background in mitigation. *See Penry*, 492 U.S. at 328, 109 S. Ct. at 2952, 106 L. Ed. 2d at __. In response, the Texas Legislature added another question, which now asks jurors: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." TEX. CRIM. PROC. CODE art. 37.071 § 2(e)(1). While applicable to current defendants for which the state seeks the death penalty, this question was not asked of the jurors in Flores's case.

At the time Flores was convicted, a Texas capital jury was not asked explicitly whether there were any mitigating circumstances which could lead them to impose a sentence less than death. Since "[t]he Texas statute d[id] not explicitly speak of mitigating circumstances; it direct[ed] only that the jury answer . . . questions," *Jurek*, 428 U.S. at 272, 96 S. Ct. at 2956, 49 L. Ed. 2d at __,[6] the "sentencing" hearing entailed a "risk that the death penalty w[ould] be imposed in spite of factors which may call for a less severe penalty," *Lockett*, 438 U.S. at 605, 98 S. Ct. at 2965, 57 L. Ed. 2d at __. Because of this risk, the Court has held that each case must be examined on its facts to make sure that any potentially mitigating facts were not excluded from the jury's consideration. *See Jurek*, 428 U.S. at 272, 96 S. Ct. at 2956, 49 L. Ed. 2d at __; *Penry*, 492 U.S. at 316, 109 S. Ct. at 2945-46, 106 L. Ed. 2d at __. As the Court described in *Penry*, "[w]hen the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Penry*, 492 U.S. at 316, 109 S. Ct. at 2945-46, 106 L. Ed. 2d at 284 (citing *Lockett*, 438 U.S. at 605, 98 S. Ct. at 606, 57 L. Ed. 2d at __).

Based on this premise, the Court has considered various claims that mitigating evidence was made irrelevant by the Texas capital sentencing scheme, thus rendering the scheme unconstitutional as applied. The Court has held that Texas's "special issues" adequately individualize the capital sentencing hearing because, taken together, they allow juries "to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion." *Lowenfield v. Phelps*, 484 U.S. 231, 245 108 S. Ct. 546, __, 98 L. Ed. 2d 568, __ (1988); *see also Jurek*, 428 U.S. at 272, 96 S. Ct. at 2956, 49 L. Ed. 2d at __. Specifically, in *Franklin*, the Court upheld the Texas capital sentencing system because issues concerning the background of the defendant and their prior record (or lack thereof) are relevant to the jury's consideration of the second special issue. "In resolving the second Texas Special Issue the jury was

---

6    The Court has clearly held that it is constitutionally adequate to limit the consideration of mitigating evidence "only to inform the jury's consideration of the answers to the Special Issue questions." *Franklin*, 487 U.S. at 182, 108 S. Ct. at 2332, 101 L. Ed. 2d at 171

11

surely free to weigh and evaluate petitioner's disciplinary record as it bore on his 'character')) that

is, his "character as measured by likely future behavior." *Franklin*, 487 U.S. at 182, 108 S. Ct. at

2332, 101 L. Ed. 2d at 168.

Accordingly, under Supreme Court precedent, the Texas capital sentencing statute adequately

individualizes the sentencing hearing of each defendant because his or her background, prior criminal

record, and character are relevant to the second special issue: whether the defendant would constitute

a "continuing threat to society."

**III.**

In cases where the State of Texas seeks the death penalty, the state frequently introduces

psychological testimony as "expert" testimony to support its claim of future dangerousness. Dr.

Griffith is frequently the state's star witness.[7] The Texas Court of Criminal Appeals has repeatedly

---

7    A brief search of the cases reveals that, in those cases which
have produced published opinions, Dr. Griffith has testified "yes"
to the second special issue on twenty-two occasions, and "no" on
zero occasions. *See Miller v. Johnson,* 200 F.3d 274, 287 (5th Cir.
2000); *Barber v. Johnson*, 145 F.3d 234, 235 & n.9 (5th Cir. 1998);
*Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998); *Ex Parte
Gardner*, 989 S.W. 2d 189, 190 (Tex. Crim. App. 1996); *Massey v.
State*, 933 S.W. 2d 141, 156 (Tex. Crim. App. 1996); *Soria v. State*,
933 S.W. 2d 46, 52 (Tex. Crim. App. 1996); *Purtell v. State*, 761
S.W. 2d 360, 373, *reh'g granted* 1994 WL 18209, *appeal after new
trial* 910 S.W. 2d 145, 146 (Tex.App.))Eastland 1995, pet. ref'd);
*Clark v. State*, 881 S.W. 2d 682, 697 (Tex. Crim. App. 1994) (en
banc); *Ex Parte Barber*, 879 S.W. 2d 889, 891 (Tex. Crim. App. 1994)
(en banc); *McBride v. State*, 862 S.W.2d 600, 607 (Tex. Crim. App.
1993) (en banc); *Joiner v. State*, 825 S.W. 2d 701, 707 (Tex. Crim.
App. 1992) (en banc); *Spence v. State*, 795 S.W. 2d 743, 762 (Tex.
Crim. App. 1990) (en banc); *Bethard v. State*, 767 S.W. 2d 423, 435
(Tex. Crim. App. 1989) (en banc); *Fearance v. State*, 771 S.W. 2d
486, 512 (Tex. Crim. App. 1989) (en banc); *Holland v. State*, 761
S.W. 2d 307, 323 (Tex. Crim. App. 1988); *Pyles v. State*, 755 S.W.
2d 98, 118 (Tex. Crim. App. 1988) (en banc); *Gardner v. State*, 733
S.W. 2d 195, 198 (Tex. Crim. App. 1987) (en banc); *Mays v. State*,
726 S.W. 2d 937, 950 (Tex. Crim. App. 1986) (en banc); *Nethery v.
State*, 692 S.W. 2d 686, 709 (Tex. Crim. App. 1985) (en banc); *Smith
v. State*, 683 S.W. 2d 393, 408 (Tex. Crim. App. 1984) (en banc);
*Holloway v. State*, 691 S.W. 2d 610, 616 (Tex. Crim. App. 1984) (en
banc), *vacated* 475 U.S. 1105, 106 S. Ct. 1508, 89 L. Ed. 2d 908
(1986); *Ex Parte Padgett*, 673 S.W. 2d 303, 308 (Tex. App.))Dallas
1984), *aff'd* 717 S.W. 2d 55 (Tex. Crim. App. 1986).

upheld the admissibility of such testimony in general and the expert testimony of Dr. Griffith in particular, noting:

> Dr. Griffith's educational background, including the subspecialty of forensic psychiatry, teaching experience, and long-term private practice. This included examining over 8,000 people charged with criminal offenses and testifying in approximately 97 capital murder trials in Texas and other states.

*Clark v. State*, 881 S.W.2d 682, 698 (Tex. Crim. App. 1994); *see also Massey v. State*, 933 S.W.2d 141, 156-57 (Tex. Crim. App. 1996) (noting that, by the time he testified in Massey's trial, Griffith had testified in 146 capital murder cases). In general, the Court of Criminal Appeals has held that "psychiatry is . . . sufficiently advanced to permit predictions of future violent behavior," *Fuller v. State*, 829 S.W. 2d 191, 195 (Tex. Crim. App. 1992) (en banc) (citing *Chambers v. State*, 568 S.W. 2d 313, 324 (Tex. Cr. App. 1978) and *Nethery v. State*, 692 S.W. 2d 686, 708-09 (Tex. Crim. App. 1985)), and generally admissible under the Texas Rules of Evidence.[8]

This court, *see, e.g. Little v. Johnson*, 162 F.3d 855, 863 (5th Cir. 1998), as well as the Texas Court of Criminal Appeals, often rests the admissibility of this type of testimony on the precedent of *Barefoot v. Estelle*, 463 U.S. 880, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983). In *Barefoot*, the Supreme Court squarely rejected the claim that the unreliability of psychiatric predictions of future dangerousness should render it inadmissible, asserting that:

> If the likelihood of a defendant committing future crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, and if it is not

---

8    In *Fuller v. State*, 829 S.W. 2d 191, 195 (Tex. Crim. App. 1992) (en banc), the Court of Criminal Appeals analyzed the argument that psychological testimony on future dangerousness should be inadmissible because of its lack of acceptance among psychiatrists and lack of reliability. Analyzing the claim under the Texas Rules of Criminal Evidence 702 and 705 and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), the Court relied on prior precedent and allowed the testimony. *Id.* However, the court made sure to hold that "[w]e of course express no view concerning the effect of evidentiary rules not yet discussed in the case law on the subject." *Id.* The Court has not reevaluated its sentiments now that *Frye* has been overruled and replaced with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)..

> impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.

*Id.* at 896-97, 103 S. Ct. at 3396, 77 L. Ed. 2d at __. The Court held that, even assuming that this evidence was unreliable, the adversary system would redress this problem by creating a credibility evaluation by the jury; the defense could, through its own experts, challenge a state psychiatrist's testimony in particular or the practice of predicting future dangerousness in general. *See id.* at 898, 103 S. Ct. at 3398, 77 L. Ed. 2d at __ ("If [psycho logists] are so obviously wrong and should be discredited, there should be no insuperable problem in doing so by calling members of the Association who are of that view and who confidently assert that opinion in their amicus brief.").[9] The Court held that, faced with conflicting evidence on the reliability of such predictions in general and the future dangerousness of the defendant in particular, the jury could adequately process the information and come to a rational evaluation of the defendant.

The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific. It is as true today as it was in 1983 that "[n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right." *Id.* at 920, 103 S. Ct. at 3409, 77 L. Ed. 2d at __ (Blackmun, J., dissenting) (citing studies).[10] As those in the field have often noted, nothing within

---

9    Storrs's cross examination of Dr. Griffith, though in the end fruitless, vigorously challenged the reliability of psychological predictions of future dangerousness in general.

10    One commentator recently reviewed the psychological research on the issue post-*Barefoot* and concluded that "whereas first generation research suggested that perhaps one out of three people predicted to engage in some kind of violent behavior will actually go on to do so, more recent studies suggest that one out of every two people predicted to be violent would go on to engage in some kind of legally relevant, violent behavior." Randy Otto, *On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature*, 18 LAW. & PSYCHOL. REV. 43, 63 & n. 63 (1994).

the training of a psychiatrist makes him or her particularly able to predict whether a particular individual will be a continuing threat to society. *See* Brief of the American Psychiatric Association, *Barefoot v. Estelle*, 463 U.S. 880 (1983) (hereinafter "APA Br."), at 9 ("psychiatrists . . . bring no special interpretative skills"). In fact, not even the *Barefoot* majority could identify a "scientific" basis for predictions of future dangerousness; its opinion expressly rests on the analysis that "even a lay person" could make such predictions. *See Barefoot*, 463 U.S. at 896-97, 103 S. Ct. at 3383, 77 L. Ed. 2d at __.

The inadequacy of the science underlying Dr. Griffith's testimony become strikingly apparent when considered relative to scientific evidence generally admissible at trial. In the federal courts, one does not become qualified to provide "expert scientific" evidence merely by virtue of possessing a medical or other advanced degree; rather, "[t]he adjective 'scientific' implies [that one's opinion has] a grounding in the methods and procedures of science." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90, 113 S. Ct. 2786, 2795-96, 125 L. Ed. 2d 469, __ (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, __ U.S. __, __, 119 S. Ct. 1167, 1176-77, __ L. Ed. 2d __, __ (1999) (approving district court's rejection of expert scientific testimony because despite the expert's qualifications, including a masters degree in mechanical engineering, 10 years in practice, and prior testimony in similar cases, "it doubted, and then found unreliable, the methodology employed by the expert"). Under the Federal Rules of Evidence, expert testimony is not admissible unless "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, __ U.S. at __, 119 S. Ct. at 1176, __ L. Ed. 2d at __; *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 359, 371 (5th Cir. 2000).[11]

---

11    It is well settled that, in the federal courts, the rules of evidence generally do not apply at a sentencing hearing, even one in which the death penalty is a possibility. *See United States v. Young*, 981 F.2d 180, 187-88 (5th Cir. 1992); *DelVecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1987-88 (7th Cir. 1994) (en banc) ("There is no exception to this rule in a capital case."). However, the cardinal concern of the rules of admissibility for expert testimony) ) reliability, *see Daubert*, 509 U.S. at 589, 113 S. Ct. at 591, 125 L. Ed. 2d at __ ("[T]he trial judge must ensure that any and all

To address this particularized need for reliability in expert scientific testimony, the Supreme Court has set out five non-exclusive factors to assist trial courts' determination of whether scientific evidence is reliable, and thus admissible. Those factors are:

(1) whether the theory has been tested,
(2) whether the theory has been subjected to peer review and publication,
(3) the known or potential rate of error
(4) the existence of standards controlling the operation of the technique, and
(5) the degree to which the theory has been generally accepted by the scientific community.

*Daubert*, 509 U.S. at 593-94, 113 S. Ct. at 2796-97, 125 L. Ed. 2d at __; *see also Moore v. Ashland Chemical Inc.*, 151 F.3d 259, 275 (5th Cir. 1998) (en banc), *cert. denied* __ U.S. __, 119 S. Ct. 1454, 143 L. Ed. 2d 541 (1999). On the basis of any evidence thus far presented to a court, it appears that the use of psychiatric evidence to predict a murderer's "future dangerousness" fails all five *Daubert* factors.[12] First, "testing" of these theories has never truly been done, as "such predictions often rest

---

scientific testimony or evidence admitted is not only relevant, but reliable.")) is also the paramount concern in addressing the constitutionality of capital sentencing procedures. This cannot be mere coincidence. *See infra* note 11.

12  It bears mentioning that Justice Blackmun, the author of *Daubert*, was also the author of the *Barefoot* dissent which harshly criticized the use of psychiatric evidence of future dangerousness. Accordingly, several commentators have questioned the viability of the *Barefoot* majority's analysis post-*Daubert*. *See, e.g.,* Erica Beecher-Monas & Edgar Garcia-Rill*, The Law & The Brain: Judging Scientific Evidence of Intent*, 1 J. App. Prac. & Process 243, 222 (1999) ("The [*Barefoot*] Court acknowledged the American Psychiatric Association's opposition to future dangerousness testimony because of its extreme unreliability. Nonetheless, it found that because the Association did not claim that psychiatrists were always wrong with respect to future dangerousness predictions))only that they were wrong more often than not))it would not exclude such testimony. In light of *Daubert*'s emphasis on acceptable error rates, however, *Barefoot*'s decision is highly questionable."); Michael H. Gottesman, *From Barefoot to Daubert to Joiner: Triple Play or Double Error*, 40 Ariz. L. Rev. 753, 755 (1998) ("*Daubert* cannot be squared with *Barefoot*."); Randy Otto, *On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature*, 18 Law & Psychol. Rev. 43, 64 & n.65 (1994); Paul C. Giannelli, *"Junk Science": The Criminal Cases*, 84 J. Crim. L. and Criminology 105, 112 (1993). In light of the Court's embracing of the *Daubert* analysis, Justice Blackmun's statement that "[i]t is impossible to square

. . . on psychiatric categories and intuitive clinical judgments not susceptible to cross-examination and rebuttal." *Barefoot*, 463 U.S. at 932, 103 S. Ct. at 3414-15, 77 L. Ed. 2d at __ (Blackmun, J., dissenting) (citing Dix, Expert Prediction Testimony in Capital Sentencing: Evidentiary and Constitutional Considerations, 19 AM. CRIM. L. REV. 1, 16 (1981)); *see also* APA Br. at 17 ("Because most psychiatrists do not believe that they possess the expertise to make long-term predictions of dangerousness, they cannot dispute the conclusions of the few who do.").[13]  Second, as is clear from a review of the literature in the field, peer review of individual predictions is rare, and peer review of making such predictions in general has been uniformly negative.  *See, e.g.,* Grant Morris, *Defining Dangerousness: Risking a Dangerousness Definition*, 10 J. CONTEMP. LEGAL ISSUES 61, 85-86 (1999) (citing studies) ("More than twenty years ago, Alan Stone acknowledged that psychiatrists cannot predict whether a person will engage in dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence.  As to clinically-based predictions of dangerousness, the passage of time has not altered the accuracy of Stone's judgment.").  Third, the rate of error, at a minimum, is fifty percent, meaning

admission of this purportedly scientific but actually baseless testimony with the Constitution's paramount concern for reliability in capital sentencing," *Barefoot*, 463 U.S. at 924, 103 S. Ct. at 3410, 77 L. Ed. 2d at __ (Blackmun, J., dissenting) becomes even more forceful.

13   In a recent case describing what "scientific testimony" should be admissible as "expert testimony" at trial, Justice Stevens attempted to describe a type of testimony so scientifically unreliable as to be inadmissible.  He stated that "[a]n example of 'junk science' that should be excluded under *Daubert* as too unreliable would be the testimony of a phrenologist who would purport to prove a defendant's future dangerousness based on the contours of the defendant's skull."  *General Electric Co. v. Joiner*, 522 U.S. 136, __, 118 S. Ct. 512, 522 n.6, 139 L. Ed. 2d 508 (1997) (Stevens, J., concurring).  Based on all known studies, which state that at best one in three psychiatric predictions of future dangerousness is correct, one cannot say with certainty that the testimony of a phrenologist would be less reliable.  More importantly, based on the fact that nothing within a psychologist's training could prepare him or her in expertise on "future dangerousness," the phrenologists's testimony appears no less scientific.

such predictions are wrong at least half of the time. *See, e.g.,* Otto, *supra* note 11, at 64 & n.65. Fourth, standards controlling the operation of the technique are nonexistent. *See* APA Br. at 13 (noting that "the professional literature demonstrate[s] no reliable criteria for psychiatric predictions of long-term future behavior"). Overall, the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness.

As some courts have indicated, the problem here (as with all expert testimony) is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an "expert") gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact.[14] As has been previously recognized, when a medical doctor testifies that "future dangerousness" is a scientific inquiry on which they have particular expertise, and testifies that a particular defendant would be a "continuing threat to society," juries are almost always persuaded. *See, e.g., Satterwhite*, 486 U.S. at 258, 108 S. Ct. at 1799, 100 L. Ed. 2d at __ ("[Dr. Grigson's] testimony stands out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message . . . that [the defendant] was beyond the reach of psychiatric rehabilitation."); *Barefoot*, 463 U.S. at 916, 103 S. Ct. at 3407, 77 L. Ed. 2d at __ (Blackmun, J., dissenting) ("In a capital case, the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself."); *White v. Estelle*, 554 F. Supp. 851, 858 (S.D. Tex. 1982) ("[W]hen this lay opinion is proffered by a witness bearing the title of 'Doctor,' its impact on the jury is much greater than if it were not masquerading as something it is not."). Jurors, faced with the responsibility of

14   In this case, Dr. Griffith's testimony began with his qualifications, wherein he described the "scientific" nature of the inquiry. He testified that "psychiatry is a branch of medicine or a specialty in medicine which deals with the diagnosis and treatment of emotional or mental disorders and evaluation of people to see if they have any," and that because of his "personality," the chances of Flores being rehabilitated were "essentially none."

determining whether an individual who committed at least one murder will kill or otherwise commit violence again, and threatened with the immeasurable potential consequences of an incorrect determination, are understandably likely to defer to an "expert" determination which will eliminate those consequences, even if its reliability is questioned by another "expert." *See* APA Br. at 9 ("[I]t permits the jury to avoid the difficult actuarial questions by seeking refuge in a medical diagnosis that provides a false aura of certainty."); Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 STAN. L. REV. 1447, 1469-70 & n.113 (1997) ("In this light, capital penalty trials sometimes become forums in which grossly prejudicial and unreliable predictions of future dangerousness are presented with the imprimatur of state authority.") (citations omitted).[15]

## V.

The testimony of Dr. Griffith, who has never met Flores, is particularly assailable. First, Griffith testified that Flores's "character and crime" made him a future danger without ever examining him. The practice of predicting future dangerousness without an individualized meeting with the subject is, while acceptable under Supreme Court precedent, *see Barefoot*, 483 U.S. at 903, 103 S. Ct. at 3400, 77 L. Ed. 2d at __,[16] condemned by most in the field as inherently unreliable and

---

15     *See also* Richard H. Underwood, *X-Spurt Witnesses*, 19 AM. J. TRIAL ADVOC. 343, 348 (1995) ("The higher the stakes in the case, the more likely the 'appeal to authority' will work."); Edward H. Mantell, *A Modest Proposal to Dress the Emperor: Psychiatric & Psychological Opinion in the Courts*, 4 WIDENER J. PUB. L. 53, 65–66 (1994) ("Given a choice between an expert who says that he can predict with certainty that the defendant, whether confined in prison or free in society, will kill again, and an expert who says merely that no such prediction can be made, members of the jury charged by law with making the prediction surely will be tempted to opt for the expert who claims he can help them in performing their duty, and who predicts dire consequences if the defendant is not put to death.").

16     The *Barefoot* majority, giving credence to the scientific basis for such opinions given without the benefit of an individual interview, asserted that:

       Medical men . . .may give their opinions not only the state of a patient they may have

unscientific as well as unethical. *See* APA Br. at 9, 18-26 ("Absent an in-depth psychiatric examination and evaluation, the psychiatrist cannot exclude alternative diagnoses; nor can he assure that the necessary criteria for making the diagnosis in question are met. As a result, he is unable to render a medical opinion with a reasonable degree of certainty."); *see also White*, 554 F. Supp. at 858 ("The prevailing view among psychiatrists and professional psychiatric associations, a view to which this court subscribes, is that to the extent that long-range dangerousness can be predicted (a view not accepted by the psychiatric community), an opinion as to an individual's future penchant for violence which does not follow extensive examination is not based on a great deal of complex and in-depth information, is not a professional, but a lay opinion."). In fact, one psychiatrist notorious for predicting dangerousness without examining the subject, Dr. James Grigson, has been evicted from the American Psychiatric Association for ignoring repeated warnings to stop the practice. *See, e.g.,* Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345, 372 (1998) ("The expulsion, perhaps, was too late for many defendants.").[17] In this case, not only did Griffith testify

---

visited . . . but also in cases where they have not themselves seen the patient, and have only heard the symptoms and particulars of his state detailed by other witnesses at the trial.

*Id.* at 903, 103 S. Ct. at 3400, 77 L. Ed. 2d at __ (citing *Spring Co. v. Edgar*, 99 U.S. 645, 657, 25 L. Ed. 487 (1978)).

17     Dr. Grigson's notoriety earned him the title "Dr. Death." *See generally* Ron Rosenbaum, *Travels With Dr. Death*, VANITY FAIR, May 1990, at 206. Grigson's fame began with his testimony in the trial of Randall Dale Adams, where Grigson testified that he was one hundred percent certain Adams would kill again, and after it was revealed that the evidence against Adams was falsified by the police, Adams was released as innocent. After Grigson testified in hundreds of capital sentencing hearings, the APA and the Texas Society of Psychiatric Physicians ousted him from their organizations for "arriving at a psychiatric diagnosis without examining the individuals in question and for indicating, while testifying as an expert witness, that he could predict with 100 percent certainty that the individuals would engage in future violent acts." Laura Beil, *Groups Expel Psychiatrist Known for Murder Cases*, THE DALLAS MORNING NEWS July 26, 1995, at 21A; *Dr. Death Loses 2 Memberships Over Ethics Accusations*, THE FORT-WORTH STAR-

that he could accurately predict a defendant's future dangerousness from a hypothetical, but he also told the jury that actually examining the defendant is "a hindrance in comparison to a hypothetical question."

Second, Griffith's deduction, with certainty, that Flores would be a "future danger," was based exclusively on the facts surrounding Flores's crime. Griffith testified, in relevant part, that:

> First of all, this very vicious hideous murder was unprovoked, no evidence at all of any provocation, which means this individual acted from within himself, inner urge, not from any external stimulus . . . Over the years that this type of personality has been studied, it is very apparent that these people with this type of personality who commit this type of murder are go ing to be violent again.. . . This) ) this in itself is enough to tell us that the person's going to be violent in the future.
>
> We go on with the type of torture that he did to this young lady, tortured her, raped her, and then stabbed her front and back many times. This is a desire to kill. What was behind this desire to kill I have no idea. We don't know but it's a desire to kill.
>
> Further, he goes back to an area close to where he picked her up . . . then he goes and gets a drink of water. He's not concerned, not disturbed, and then he goes and lays down and goes to sleep. Anybody that has any conscience at all is not going to lay down and go to sleep. He's not going to be comfortable. This man shows no evidence from the information that I have of any guilt, any remorse. . . .
> All of these things together tell me that this man will be violent in the future and no matter where he is. It doesn't make any difference. Sooner or later he's going to be violent. You can't get worse than what he did except in terms of numbers.

The Court of Criminal Appeals noted that Griffith's conclusion that Flores was not remorseful was based on the fact that "[t]here was no evidence . . . from which he could deduce any remorse or concern or the victim." *Flores*, 871 S.W. 2d at 716. Given that Griffith never spoke to Flores, the fact that he failed to find "evidence" of any given personality trait is not surprising. Griffith's testimony to the extent that an individual with this "personality" would be dangerousness, moreover, was based on the "personality" of someone who would commit this unprovoked murder in general, not Flores's personality in particular.[18]

---

Telegram July 27, 1995, at A25.

18    Griffith's testimony was also based on some items which were found in Flores's mother's car, and there was conflicting testimony on whether those items belonged to Flores.

In fact, as noted by the dissent on direct appeal, Dr. Griffith's testimony on cross-examination revealed his feeling that he could predict an individual's future dangerousness merely by knowing their crime, and his belief that anyone who committed capital murder in general, or murder in the course of sexual assault in particular, would be a 'future danger' simply for the fact that they committed that particular crime. *See Flores*, 871 S.W.2d at 724 (Clinton, J., dissenting). As Griffith testified, *inter alia*,

> Q:    Anyone convicted of capital murder would, in your opinion would, commit future acts of violence.
>
> A:    Yes, that's my opinion. I would not want to, you know, say this for somebody that I didn't know specifically about but everyone that I know about, this is true.
>
> Q:    Have you ever testified in a case wherein an individual has been convicted of murder in conjunction with a rape that he would not be a future threat to society and commit future acts of violence?
>
> A:    I don't believe so.
>
> Q:    So, that is one area that you are firm in?
>
> A:    Yes, sir.
>
> Q:    Okay. So them basically your bottom line analysis is that the crime itself is all it takes for you to make your prediction?
>
> A:    This is, yes, what I started out saying.

*Flores*, 871 S.W.2d at 724-5 (Clinton, J., dissenting).

In sum, Dr. Griffith testified that Flores would be a "future danger," without examining Flores, because one with the "personality" to commit the crime Flores committed would be a "continuing threat to society." Based almost exclusively on this testimony, and irrespective of Flores's complete lack of a criminal record, family abuse, or truculent past, the jury answered "yes" to the second special issue.[19] Accordingly, Flores was sentenced to death.

---

19    In this respect, there is a complete dissonance between Flores's crime and his life prior to the crime, and the juxtaposition gives no explanation as to why this crime occurred. Griffith testified, essentially, that Flores's past was irrelevant to his determination; based on one heinous incident, Flores was a

22

Flores's crime was undeniably brutal. He waited for the victim outside her workplace, forced her into his car, and drove to a remote location where he sexually assaulted the victim and stabbed her ten times. Under Texas law, the facts of Flores's crime may alone have been sufficient to uphold the jury's finding on the second special issue. *See Kunkle v. State*, 771 S.W. 2d 435, 449 (Tex. Crim. App. 1986) (en banc) ("If the offense was shown to be sufficiently cold-blooded or calculated, then the facts of the offense alone may support a finding that the defendant will pose a continuing threat to society."); *Dinkins v. State*, 894 S.W. 2d 330, 358 (Tex. Crim. App. 1995) (en banc) ("we have typically required those circumstances to be so heinous as to display a 'wanton and callous disregard for human life'"). However, future dangerousness, like any other element of the crime, must be proven beyond a reasonable doubt. *See Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102, 111 L. Ed. 2d 606, __ (1990); *Brooks v. State*, 990 S.W. 2d 278, 284 (Tex. Crim. App. 1999) ("The burden is on the State to prove the future dangerousness issue beyond a reasonable doubt."). While a reasonable jury could have found the facts surrounding Flores's crime alone sufficiently egregious to warrant the death penalty, without the benefit of Griffith's "expert" opinion its decision would have been significantly more difficult.

## VI.

Flores does not allege, nor does the record indicate, that under the Texas capital sentencing scheme, a defendant is prevented from presenting mitigating evidence, such as the lack of a criminal, juvenile, or psychiatric background, from the jury, should he or she (or, in this case, his or her attorney) choose to do so. However, to satisfy the Supreme Court's commands for an individualized sentencing hearing, "[i]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to *consider and give effect* to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate

---

continuing threat to society. This determination was based on Griffith's feeling that one with the "personality" to commit this crime was inherently dangerous.

23

sentence." *Penry*, 492 U.S. at 319, 109 S. Ct. at 2947, 106 L. Ed. 2d at 279 (emphasis added) (citations omitted); *see also Woodson*, 428 U.S. at 304, 96 S. Ct. at 2991, 49 L. Ed. 2d at __ ("A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.").

Based on the above analysis, one can glean a clear dichotomy. First, under Supreme Court precedent, the Texas "special issues" sufficiently individualize capital sentencing hearings because the individuality of a defendant's background is relevant to the jury's consideration of the second special issue. However, under the Texas evidentiary scheme, a psychiatrist's "scientific" testimony that a defendant will be a "future danger," even if given without examining the defendant, and even if based *solely* on the crime a defendant has committed, is not only sufficient to sustain an affirmative answer to the second special issue,[20] but is frequently the primary, or the only, reason for a jury's affirmative answer.

I recognize the viciousness of Flores's crime. I also recognize the jury's statutory right to impose death as an appropriate punishment. However, what separates the executioner from the murderer is the legal process by which the state ascertains and condemns those guilty of heinous crimes. If that process is flawed because it allows evidence without any scientific validity to push the jury toward condemning the accused, the legitimacy of our legal process is threatened. The Supreme Court has made clear that the constitutionality of a state's capital sentencing scheme is dependent on

---

20    In fact, as the Court of Criminal Appeals here noted, subject to one extreme exception, "it is . . . true that we have not found the evidence in any case to be insufficient [to prove future dangerousness] where the State offered psychiatric testimony that the defendant would constitute a continuing danger to society." *Flores*, 871 S.W.2d at 717 & n.3 (citing cases).

24

the individualized basis in which defendants are considered. I question whether that concern for individuality exists under a system which not only admits expert testimony deduced without examining the subject but also, as in this case, accepts the possibility that jurors will allow that evidence, rather than factors more personal to a defendant's crime and character, to effectively condemn that individual to death.