**AFFIRMED and Opinion Filed August 13, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-22-01209-CR

**SHAWNE FORREST, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-83400-2017**

## MEMORANDUM OPINION

Before Justices Carlyle, Goldstein, and Breedlove
Opinion by Justice Goldstein

Shawne Forrest appeals his injury to an elderly person with a deadly weapon conviction. A jury convicted appellant and sentenced him to seven years' confinement. In three issues, appellant argues statements made by the trial court during voir dire violated his due process rights, the trial court erred in denying his request to admit video-recorded statements of a deceased witness, and the evidence is legally insufficient to support his conviction. We affirm the trial court's judgment.

**BACKGROUND**

In October 2017, appellant was charged by indictment with (1) causing serious bodily injury to Landi Dyess by gouging Dyess' eye with appellant's finger and, during the commission of the offense, appellant used or exhibited a deadly weapon, his hand and finger and (2) causing serious bodily injury to Dyess, an individual 65 years of age or older, by gouging Dyess' eye with appellant's hand and finger. The indictment alleged the offense occurred on or about November 24, 2015, and noted the indictment was a "re-indictment of 366-81380-2016."

At the beginning of voir dire in October 2022, the trial court made the following opening remarks to the jury:

> And we have our jury system. People have fought and bled for it, right? They died for those things in the Constitution, and because of that, it's really important to me. I've taken a lot of oaths. Oaths to become a citizen, to become an officer in the Air Force, to become a judge, to become a lawyer. Those are all very important to me. And at the heart of it we also promise to defend the Constitution. And it is, again, very important to me that we do so. And you guys showed up and that's part of it. Again, that's why we're here. We have this system where 12 people make a decision as to what happened on a particular day. That's really what we're doing on any kind of case, whether it's a car wreck case, felony trial or family law matter. We usually get 12 people to decide what did or didn't happen. And, you know, sometimes people have an issue with that. They say, oh, well, I don't want to come down here because I don't want to judge people or do any of those things. You're not. Again, we're asking you in most of those situations to make a decision about what happened on a particular day. And that's what a jury does. And it's like you're writing a little bit of a law. We, the people of Texas, agree that on such and such date something happened.

. . .

–2–

But there's a process to what we have to do. And, again, the process is a lot of just making sure that the rules are being followed so that we get the right kind of people to sit on this jury, which is why we have 70 of you guys in here today. We have 70 people. From that, we're going to get our 12 jurors to sit on the jury and resolve our issue for us, right? Because there's two sides. There's two sides. One side thinks this, the other side thinks this. We need 12 people to make that decision as to which side has it right.

And I will tell you it's an amazing thing when you get 12 strangers in a room and they can come to a decision. It is, I think, just an amazing, amazing thing that happens, again, not many places in the world. And so the fact that 12 strangers come together and can make a decision like that on a regular basis, I think just, again, gives credence to the idea that we're doing things the right way here. It may not be perfect. It certainly isn't. But it is the best there is and I can tell you that from experience, and I tell you that from being other places. This is a system that works really, really well.

Appellant did not object to the trial court's comments.

The State called two witnesses in its case-in-chief, and the defense called the appellant and two additional witnesses. Trial progressed, and the witnesses testified[1] as follows.

1. **Complaining Witness: Dyess testimony**

Dyess testified that he was born in September 1948. On November 24, 2015, Dyess visited several stores looking for items his daughter asked him to bring for Thanksgiving. Dyess was driving his "old Chevy van," and he returned to his apartment complex, parked, briefly went inside his apartment, and returned to sit in his van and text his daughter. Dyess heard a bump and looked into his side mirror

---

[1] We have only addressed testimony necessary for a determination of the issues raised on appeal.

where he saw appellant approaching. Appellant's face was "all distorted," and he was mumbling. Appellant said, "handicapped man, I'm going to kill you," grabbed the door handle, and opened the door. Appellant grabbed Dyess by the chin and the back of the head, "spinning" Dyess' head three times before lifting Dyess out of the van and throwing him to the ground. Appellant jumped on Dyess and put him in a headlock. Dyess was able to turn so that he could "breathe into [appellant's] armpit, but this made appellant "even more agitated." Appellant "stuck his finger in [Dyess'] eye" and "just kept doing it." Dyess "hear[d] a voice and it said, 'in your pocket.'" Dyess "had a calm, a peace over" him, and he reached his free right hand into his pocket and got a "little knife"[2] out of his pocket and "squeezed it open." Dyess "stuck it to [appellant's] back" and "thought he's going to run," but appellant "didn't do anything." Dyess considered reaching up and raking appellant with the knife, but he "had another thought" that he should not do that because then appellant would get the knife and Dyess would be "the one that's going to die." When appellant did not react to repeated stabbing, Dyess started "sewing machine-type stabbing" and called for help. A neighbor heard Dyess, and the neighbor and "somebody else come running" and pulled appellant off Dyess. Dyess pulled himself under the van and said "don't let him get me again." When Dyess came out from under the van, someone helped him call his daughter and told her he had been

---

[2] The State introduced a photo of Dyess' knife showing that it was "about three and a half inches long" and had a "little indentation so that you can open it with one hand."

attacked. Dyess' daughter "got there before the police did." Meanwhile, Dyess got in his van and "just wanted to get away," so he "drove around little a horseshoe," hit the brake, and "may have gone out then" because he did not remember "them taking me out of the van or anything." As a result of the assault, Dyess permanently lost the sight in his right eye.

2.      **Eyewitness testimony:**

Andrea Quinonez testified she lived in Dyess' apartment complex in November 2015. On the evening of the offense, Quinonez was driving back to her assigned parking spot with her mother and sister in the car when she saw that a van was parked across from her parking spot so that she could not pull in. Quinonez recognized the van "because it belonged to someone that lived there." Quinonez looped around to park in the visitor's parking. On her way, she saw a man standing in the roadway. The man's "pants were very low and he was very agitative." The man's hands were in the air, and he was screaming "something about aliens" and jumping. Because it was so cold outside, "he had all this smoke so, obviously, he was sweating a lot." Quinonez was "fearful" of the man and concerned because she had her mother and sister in the car. Once Quinonez parked her car, the man was right behind her, and she made sure the doors were locked and told her mother and sister not to get out of the car. The man "kept saying stuff about the aliens and the end of the world."

Quinonez called 9-1-1 and told the operator there was a strange man in her apartment complex and she was scared. As she continued to speak with the operator, Quinonez decided to back up her car, and the 9-1-1 operator asked for the man's location. Quinonez answered that she could not see because the man "sprinted pretty quickly towards that way where my parking spot was." As Quinonez drove back to her parking spot, she saw the man and another gentleman "and he was on top of that gentleman against that van that was parked behind my car." Quinonez identified the man as appellant and the other gentleman as Dyess, whom she knew. When Quinonez saw that appellant had Dyess in a headlock, she "started honking to see if [she] could get anyone's attention." Quinonez' mother told her to "keep going because she was scared of the situation," so Quinonez looped around and got out of the apartment complex before coming back to the area.

When she returned to the scene, Quinonez saw that appellant and Dyess had been separated by other neighbors, but Dyess "was on the floor and he was holding his face." Dyess was "very distraught" and "screaming a lot." Appellant was "jumping" and doing "jumping jacks"; appellant "was bleeding but he was completely acting really crazy." Quinonez could see that appellant was hurt, but it did not seem to phase him.

3.  **Defendant's testimony:  Self Defense**

Appellant testified that, on November 24, 2015, he lived in the same apartment complex as Dyess. At approximately 7:00 p.m., appellant was walking

–6–

around the apartment complex when he was "clipped by a van" on his shoulder, and the van "drove off." Appellant described this incident as "tragic" because he had been struck by a car four months earlier. Appellant "stumbled around" and fell down. A "red kind of boxcar" drove past, and appellant thought "that car may have witnessed what happened." After the red car parked, appellant stopped behind the car and was "going to go up and say, did you see anything?" but appellant "did not interact with them."

Appellant saw the van that hit him double-parked about "100 feet to 150 feet away," and he "jumped up and down again" to "try to get their attention while saying, hey, you hit me." However, "[n]obody appeared to react in – in any way that would be conducive to somebody who had just stumbled around in the middle of a parking lot." When it did not appear "that anybody was responding," appellant "ran over to the van." Appellant first "knocked on the back of the window because it was dark and [he] didn't want to scare anyone" and then "walked over to the side" and knocked on the side window. The van's "windows were completely blacked out," and appellant could not tell if anyone was in the driver's seat, yet appellant testified he could see "a shadow that [was] leaning over." Appellant's "first instinct [was] this guy is probably a drunk driver." Appellant "slapped [his] hands together one more time to see if [he] could get his attention," but there was "no reaction," so appellant attempted to open the door, which was locked.

Appellant testified the "door swung open," and a "six-foot-two giant stepped out with a knife saying this is not your vehicle, sir." Appellant spoke words in Korean that meant, "I'm so sorry. Please forgive me." Dyess "became aggressive with the knife," and appellant and Dyess "tangled up" in a standing position. At some point in the ensuing fight, Dyess dragged appellant to the ground. Appellant received, "[b]etween stabbing and slashing," seventeen stab wounds: no wounds on the "front of [his] trunk," but stab wounds on his back, elbow, cheek, and neck. After falling to the ground, appellant "restrained" the knife and "clearly said stop." A "very large gentleman was standing right above" appellant and Dyess, and appellant "was so thankful that someone had come to stop the fight;" however, both the very large gentleman and Dyess "continued to assault" appellant. Dyess "stabbed [appellant] and the other gentleman was attempting to restrain" appellant. Appellant then "clawed [Dyess'] eye in self-defense as I was suffocating to death." Appellant was able to run away "for about five seconds before passing out from blood loss." After he collapsed, appellant did not remember anything that happened except "[m]aking [his] peace with God."

On cross-examination, appellant testified he was diagnosed as bipolar in 2012 and takes a mood management stabilizer to treat his condition. At times, appellant self-medicated with marijuana for "cancer treatment," and he had smoked marijuana on the night of the assault. In response to questioning, appellant testified Dyess "did say a lot about Satan when he was stabbing me" and called appellant "a servant of

Satan." Appellant admitted he "locked up with" Dyess, one of appellant's hands was behind Dyess' neck, and appellant threw Dyess to the ground "[u]sing his forward movement towards" appellant. Appellant testified that, after he was released from the hospital where his wounds suffered in the assault were treated, his mother "forced" him to go to Green Oaks "because [he] was talking crazy." At Green Oaks, appellant stated he was "[u]nder the influence of the trazodone, Latuda, and plenty of opiates from pain medication and benzodiazepine." Appellant, when asked if it was his testimony that "that those other medications made [him] make a false admission as to the attack on Mr. Dyess," responded "I don't think a rational person would discuss a case as critical as this in a mental hospital." In response to the question "[y]ou admitted on more than one occasion, didn't you, that you committed this offense to the doctors and nurses at Green Oaks, didn't you," he responded that he did not remember his time at Green Oaks. At the conclusion of the evidence, the jury convicted appellant of injury to an elderly individual and found appellant used or exhibited a deadly weapon, his hand and fingers, during the commission of the offense. This appeal followed.

## ANALYSIS

### 1. Legal Sufficiency Challenge

We first address appellant's third issue in which he argues the evidence is legally insufficient to support the jury's verdict of guilty to the charged offense of injury to an elderly individual. We do so because, if this issue is sustained, acquittal

–9–

on the underlying offense is required. *See Burks v. United States*, 437 U.S. 1, 18 (1978) ("Since . . . the Double Jeopardy Clause precludes a second trial once a reviewing court has found evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal."); *Winfrey v. State*, 393 S.W.3d 763, 774 (Tex. Crim. App. 2013) (after concluding evidence was insufficient, court reversed judgment of the court of appeals, rendered judgment of acquittal, and cited *Burks* as requiring the remedy of appellate acquittal on grounds of evidentiary sufficiency); *Tuazon v. State*, 661 S.W.3d 178, 181 (Tex. App.—Dallas 2023, no pet.).

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.).

The factfinder is the sole judge of witness credibility and the weight to be given testimony. *See Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017). "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination." *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015).

Appellant complains the jury's verdict is "not legally sufficient based on the law and evidence to support its conviction" of appellant for the charged offense of injury to an elderly individual." Appellant bases this complaint on the fact that, although the "Term Definitions" section of the charge defined "Elderly Individual" as "a person 65 years of age or older," the "Application of Law to the Facts" section omitted this element of the offense as follows:

> If you find from the evidence beyond a reasonable doubt that on or about the 24th day of November, 2015, in Collin County, Texas, the defendant SHAWNE FORREST, intentionally or knowingly, caused serious bodily injury to Landi Dyess by gouging Landi Dyess' eye with defendant's hand and finger, then you will find the defendant guilty as charged.

Appellant "does not dispute that testimony was presented from Landi Dyess at trial regarding his date of birth and age at the time of the offense"—sixty-seven years old.

We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This standard recognizes the trier of fact as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence, and on review, we determine whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

The jury charge defined "*Elderly individual*" as a "person 65 years of age or older." The hypothetically correct jury charge in this case would have included in

the application paragraph the element that Dyess was sixty-five years old or older at the time of the offense. *See Malik*, 953 S.W.2d at 240. Measuring the evidence by the elements of this hypothetically correct jury charge, we conclude the evidence was sufficient to show Dyess was an "elderly individual" sixty-five years old or older at the time of the offense. *See id.*

Appellant next argues that the evidence was insufficient to support his conviction because "the record clearly favors" his version of the incident, and the evidence showed his conduct was justified as a means of self-defense.

The charge included the following self-defense instruction on "Justification – Self Defense":

> If you have found the defendant guilty of Injury to an, Elderly Individual, you will next consider whether the offense was committed in self-defense.
>
> A person is justified in using force against another when and to the degree, he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.
>
> The use of force against another is not justified in response to verbal provocation alone.
>
> "*Reasonable belief*" means a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.
>
> "*Unlawful*" means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege.
>
> A person who has a right to be present at the location where the force is used, who has not provoked the person against whom the force is used, and who is not engaged in criminal activity at the time the force is used is not required to retreat before using force.

–12–

In determining whether an actor who has a right to be present at the location, who had not provoked the person against whom the force was used, and who was not engaged in criminal activity at the time, reasonably believed that the use of force was necessary, you may not consider whether the actor failed to retreat.

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, SHAWNE FORREST, is guilty of Injury to an Elderly Individual, but you further find, or have a reasonable doubt thereof, that the defendant reasonably believed, or is presumed to have reasonably believed, that force, if any, was immediately necessary to protect himself against Landi Dyess' use or attempted use of unlawful force, then you will find SHAWNE FORREST conduct was justified and find the defendant "not guilty."

When it comes to sufficiency review of a self-defense claim, the court of criminal appeals has stated the following:

[I]n a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913). Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

*Braughton v. State*, 569 S.W.3d 592, 608–09 (Tex. Crim. App. 2018).

A person commits injury to an elderly individual if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to an elderly individual serious bodily injury. TEX. PENAL CODE § 22.04(a)(1). However, it is a defense to prosecution that the conduct in question is justified under Chapter 9 of the penal code. *Id.* § 9.02. A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). A person is justified in using deadly force against another if the actor would be justified in using force against the other under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a).

Here, appellant and Dyess presented conflicting versions of events. Appellant cast himself as the victim of a hit-and-run incident with a van and an attack by a "six-foot-two giant . . . with a knife" who stepped out of his van and "became aggressive" with the knife. In the altercation that followed, appellant "clawed his eye in self-defense as I was suffocating to death." Dyess depicted appellant as the aggressor and testified that appellant approached his van, his "face was just all distorted," and he grabbed the door and said "handicapped man, I'm going to kill you." He related appellant then opened the van door and grabbed Dyess by the chin and the back of the head, "spinning" Dyess' head. Dyess heard "the bones cracking,"

"it was painful," and appellant did this three times before lifting Dyess out of the van and throwing him to the ground. Appellant jumped on Dyess and put him in a headlock. Appellant "stuck his finger in [Dyess'] eye" and "just kept doing it." Dyess was able to reach into his pocket and get a "little knife" and "stuck it to [appellant's] back," but appellant "didn't do anything." When appellant did not react to repeated stabbing, Dyess started "sewing machine-type stabbing" and called for help. A neighbor heard Dyess, and the neighbor and "somebody else come running" and pulled appellant off Dyess. As a result of the incident, Dyess permanently lost the sight in his right eye.

We presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Murray*, 457 S.W.3d at 448–49. On this record, we conclude a rational trier of fact would have found the essential elements of injury to an elderly individual beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914. Accordingly, the evidence was sufficient to support appellant's conviction and the jury's rejection of his claim of self-defense. *See Jackson*, 443 U.S. at 319; *Braughton*, 569 S.W.3d at 608–09. We overrule appellant's third issue.

### 2. Voir Dire Statements

In his first issue, appellant argues the trial court made improper statements during voir dire that "violated the presumption of innocence and impermissibly created a burden to the defense." Specifically, appellant complains of the trial

court's statement that "the jury's role in trial is to decide which party, the State or the defense, is right." In his brief, appellant makes the following argument:

> In this case, the court stated to the venire panel that the trial is a contest between both sides, and the jury's role is to find out which side is right. This statement is clearly erroneous. It denied Appellant his Due Process right to a fair trial in that a criminal defendant is presumed innocent and does not carry the burden of proof. A criminal trial is not a contest between the State and the Defense. The court essentially told the venire panel that a criminal trial is a civil trial. Rather, the trial court should have stated that Due Process mandates that a criminal defendant is presumed innocent at trial, and the State carries the burden of proof to prove all the elements of the charged offense beyond a reasonable doubt.

We note that the word "contest" does not appear in the reporter's record of voir dire; therefore, appellant's contention that "the court stated to the venire panel that the trial is a contest between both sides" is a misstatement of what was said. It is true that the trial court, as quoted previously in this opinion, stated that "[w]e need 12 people to make that decision as to which side has it right." However, this statement, taken in context, albeit ill-phrased, was made in a discussion of the jury's function in making a "decision about what happened on a particular day." We read these comments by the trial court as referring to the jury's role as factfinder, not to the jury's ultimate determination of whether a defendant is guilty or not guilty. Again, the jury, as factfinder, is the sole judge of witness credibility and the weight to be given testimony. *See Martin*, 635 S.W.3d at 679. Thus, the trial court was correct in stating it is the jury's role to determine "which side has it right" in determining "what happened on a particular day." *See id.*

It is also true that the trial court's complained-of comments at this point in voir dire did not reference the State's burden of proof beyond a reasonable doubt or the presumption of innocence applicable to appellant. We surmise this is because the trial court was not yet addressing the issues of the burden of proof and the presumption of innocence. Elsewhere during the trial court's opening remarks, the record reflects that the trial court stated the following:

> Okay. So how many of y'all ever heard of the presumption of innocence? Right. Everybody should raise your hands. Civics class. Something -- so the presumption of innocence is in the Constitution. Again, it's a rule that we follow that says anybody is presumed innocent until they have been found guilty, right? So as -- everybody in this courtroom will be y'all -- have heard zero evidence about this case. So if I asked you whether or not you could find somebody guilty, the answer is no because you haven't heard any evidence. And so the answer is, no, I can't find that person guilty. What's the verdict? Not guilty. That is the presumption of innocence.

> And, again, this rule that we all know people fought and bled for, right? Died for. We have this rule that people sometimes have a -- again, just kind of a misunderstanding as to how it's applied or how we work that situation.

> So, again, right now I can tell you the State of Texas, the prosecutors are sitting in here, the defense attorneys, the judge, everybody, that is the right answer. There is no question about that. It is not guilty. That is a -- that is the right answer because you haven't heard the evidence.

> Now, what happens in a trial is you do hear evidence. And when you become convinced that somebody is, in fact, guilty, that's when you make that decision, after you've heard all of the evidence and you have now become convinced. And what's the phrase we use? Beyond?

> (Venire panel answers simultaneously.)

> THE COURT: Reasonable doubt. Somebody said "shadow." Who said shadow? You who watches TV? So that's somebody there.

–17–

VENIREPERSON: Just me. I watch way too much TV.

THE COURT: Way too much TV. Beyond a shadow of a doubt is not a thing. Okay? It's beyond a reasonable doubt. And so the reason I point that out is because there has to be reasonable doubt.

"Only when a trial court's comments during voir dire are reasonably calculated to benefit the State or prejudice the defendant's rights will reversible error occur." *Gardner v. State*, 733 S.W.2d 195, 210 (Tex. Crim. App. 1987); *Tuazon*, 661 S.W.3d at 193. Here, when the trial court's introductory statements during voir dire are viewed in their entirety, the record shows that the trial court's remarks at the beginning of voir dire did address the presumption of innocence and the beyond-a-reasonable-doubt standard, to which there is no objection on appeal. Under these circumstances, we conclude the trial court's remarks during voir dire did not constitute reversible error.[3] We overrule appellant's first issue.

### 3. Evidentiary Ruling to Exclude Evidence

In his second issue, appellant argues the trial court erred in denying him the opportunity to offer video recorded statements of a deceased witness.

---

[3] Presumably because appellant did not object to the trial court's remarks concerning "which side has it right," appellant argues at length that the complained-of remarks constitute fundamental error affecting appellant's substantial rights and a preservation of error analysis under rule 33.1 of the rules of appellate procedure does not apply. *See Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). In circumstances not present here, but to which appellant analogizes his claims, certain waivable-only claims may be argued for the first time on appeal and are not subject to a harm analysis. *See Tuazon*, 661 S.W.3d at 186–94 (addressing violation of due process right not to have the trial court define reasonable doubt in a manner that shifted the State's burden of proof). We have addressed appellant's first issue in the interests of justice. Because we conclude the trial court did not err in its statements during voir dire, we do not further address appellant's characterization of the trial court's statements or assertion of legal principles that do not apply under the facts and circumstances of this case.

In order to preserve error regarding a trial court's decision to exclude evidence, the complaining party must comply with Rule of Evidence 103 by making an "offer of proof" which sets forth the substance of the proffered evidence. TEX. R. EVID. 103(a)(2); *Mays v. State*, 285 S.W.3d 884, 889–90 (Tex. Crim. App. 2009). Rule 103(a) provides: "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and: (1) if the ruling admits evidence, a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context; or (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." TEX. R. EVID. 103(a). The offer of proof may consist of a concise statement by counsel, or it may be in question-and-answer form. *Mays*, 285 S.W.3d at 889 (citing *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998)). If in the form of a statement, the proffer "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Mays*, 285 S.W.3d at 890 (quoting *Warner*, 969 S.W.2d at 2). The primary purpose of an offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful. *Id.* A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence. *Id.*

Here, in a discussion outside the presence of the jury, the trial court noted that the State objected because the State anticipated that the defense was going to try to lay the foundation for the admissibility of a video involving a witness that was deceased. The State objected under rule of evidence 804(b)(1)(B) that:

> in order for something to be offered in a criminal case it must, number one, be given as a witness at a trial or hearing of the current or a different proceeding. And is now offered against a party who had opportunity and similar motive to develop it by direct, cross-examination, or redirect, or was taken in a deposition under and is now offered in accordance with Chapter 39 of the Code of Criminal Procedure.
>
> Based on 804(b)(1)(B) none of those things have happened in this case. The Defense is merely trying to get in a recorded statement that was made -- an officer took of a witness that was there was no opportunity for cross-examination, no redirect, no recross, nothing of that nature, there's no actual -- there was no hearing, there was no court proceeding that this was done in, and there was no deposition of this witness that was ever taken.
>
> The law has to mean something and under what the Defense is trying to do, anyone who could meet any of the things for being unavailable, we would just offer those in willy-nilly without meeting any of these requirements. Because those requirements are not met under 804(b)(1)(B), the video they are trying to admit is inadmissible.

The defense replied that the witness "appeared on every single witness list that the State has provided over the last seven years of this trial." Defense counsel stated that the defense would "waive the fact that we have not had an opportunity to talk to this person, whereas, the State likely has since it's -- they are included on the State's witness lists and they likely spoke with them in preparation for one of the several trial settings that have occurred over the last several years." Defense counsel

argued that the "subparts of 804(1)(b)(1) [sic] are not applicable to this very specific set of facts" where the witness died suddenly and there was no opportunity to comply with rule 804. The trial court and defense counsel continued a brief discussion of the admissibility of the video recording, which the trial court ultimately ruled was inadmissible. However, defense counsel did not make an offer of proof of the contents of the video other than to state it contained "witness statements." Under these circumstances, we conclude appellant failed to preserve this issue for our review. See TEX. R. EVID. 103(a)(2); *Mays*, 285 S.W.3d at 889–90. We overrule appellant's second issue.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

221209F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

SHAWNE FORREST, Appellant

No. 05-22-01209-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District Court, Collin County, Texas Trial Court Cause No. 366-83400-2017.

Opinion delivered by Justice Goldstein. Justices Carlyle and Breedlove participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered August 13, 2024